

FILED

Feb 14 2017, 9:08 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Patricia Caress McMath
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of A.F., D.F. & M.F., Minor Children, | February 14, 2017 |
| | Court of Appeals Case No. 49A04-1605-JT-1030 |
| T.F., Father, | Appeal from the Marion Superior Court |
| *Appellant-Respondent*, | The Honorable Marilyn Moores, Judge |
| v. | Trial Court Cause Nos. 49D09-1501-JT-28 49D09-1501-JT-29 49D09-1501-JT-30 |
| The Indiana Department of Child Services, | |
| *Appellee-Petitioner*. | |

**Brown, Judge.**

[1] T.F. ("Father") appeals the involuntary termination of his parental rights with respect to his daughters A.F., D.F., and M.F. Father raises one issue which we revise and restate as whether the trial court abused its discretion in admitting evidence. We affirm.

*Facts and Procedural History*

[2] Father lived with J.C. ("Mother") between 2003 and 2007. Father and Mother had A.F., born in 2005, D.F., born in 2006, and M.F. born in 2007.[1] In April 2005, Father was charged with domestic battery, battery, and invasion of privacy. In May 2005, Father was sentenced for domestic battery against Mother. In February 2006, Father was again charged with domestic battery and battery against Mother.

[3] In January 2008, the Department of Child Services ("DCS") removed the children from Father's care. That same month, Father was charged with intimidation, battery by bodily waste, and furnishing alcohol to a minor. In February 2008, Father pled guilty to battery by bodily waste and spent about 6 weeks in jail and ninety days on work release. During that time, there was a Child in Need of Services ("CHINS") case open regarding the children. In approximately January 2009, the children were returned to Father's care.

[4] In June 2009, Father was charged with resisting law enforcement and with domestic battery against Mother while the children were in the back bedroom,

---

[1] Mother signed adoption consents for the children.

and spent about one month in jail. DCS filed another CHINS petition, and Father, who was incarcerated, admitted that the children were CHINS.

[5]  In January 2010, Father was arrested for robbery with bodily injury. He pled guilty, was sentenced to two years in the Department of Correction, and was incarcerated between August 2010 and the end of 2012. The second CHINS case involving the children concluded in 2011.

[6]  Meanwhile, in May 2012, DCS filed a verified petition alleging that A.F., D.F., and M.F. were CHINS. The petition alleged in part that Father was incarcerated with an earliest expected release date of July 2014. On September 4, 2012, Father admitted that he was incarcerated and was not available to parent his children, and the court found the children to be CHINS. On September 25, 2012, the court entered a dispositional order and a parental participation order ordering Father to contact DCS within forty-eight hours of his release from incarceration to engage in services.

[7]  In November 2012, Guardian ad Litem Patti Cavanaugh ("GAL Cavanaugh") recommended that phone contact between Father and the children be suspended based on things the children had said to her at a visit she made to their foster home, including M.F. not remembering Father and A.F. not being comfortable with the phone contact.

[8]  On July 15, 2013, Father was released. The next day the court entered an order authorizing supervised parenting time for Father upon positive recommendations from the children's therapist, and ordering Father to

participate in homebased therapy and case management, a parenting assessment, and to follow any recommendations. Father participated in services.

[9] In May 2014, Father was incarcerated for violating his parole after he was charged with operating a vehicle while intoxicated and tested positive for marijuana. On December 30, 2014, the court held a hearing, and GAL Cavanaugh recommended that the plan be changed to adoption because Father had not completed services and the children had had unstable parenting for many years. The court ordered that the permanency plan for the children be adoption.

[10] On January 15, 2015, DCS filed a verified petition for the involuntary termination of Father's parental relationship with the children, and in July 2015, Father was released from incarceration.

[11] Meanwhile, on March 7 and 15, 2015, the court held an evidentiary hearing. J.O., a foster mother, testified that A.F. was placed with her in 2009 and was initially defiant, would steal and lie, had symptoms of ADHD and RAD, was harmful to animals, had re-attachment disorder, and exhibited sexual behavior. She also testified that D.F. was placed with her in 2010, 2011, and 2012, and that M.F. was placed with her in May 2012. J.O. stated that A.F. and D.F. were placed with her daughter at some point because, when DCS recommended that the children be returned to foster care, she had room for only one more child and took M.F.

[12] Father testified regarding his incarceration, participation in services, and letters to the children. When asked why he chose to engage in criminal activity while he had children, he answered: "Stupid choice. Being dumb. No real reason or explanation." Transcript at 47.

[13] During direct examination, Tequaysha Tubbs, a behavioral clinician who worked with the children from April 2014 until January 2016, testified that A.F.'s behavior of lying and stealing was a concern to her. Tubbs later stated: "I addressed with [A.F.], there were reports from foster home of lying and stealing." *Id.* at 81. Father's counsel objected on the basis of hearsay. The court stated: "she's saying what she went over with the child, so I would, I'll allow it." *Id.* Tubbs testified that stability would help A.F.'s behavior, that M.F. had incidences of stealing and lying, and that stability would help both M.F.'s and D.F.'s behaviors.

[14] Family Case Manager Henry Momo Fahnbulleh ("FCM Fahnbulleh") indicated that placement and adoption was in the best interests of the children. When asked why he thought any attempts to reunify with Father threatened the children's well-being, FCM Fahnbulleh answered:

> Because of the, the, the time lag between the, the services that [Father] has participated in, and there were, in his, in the present time, this was just from August of 2015, and this time, that he has actively participated in services, I believe, is shorter than the previous opportunities that were given to him for the children to be re-, reunified with him. So it would be a disruption of their, of their family at this time.

*Id.* at 128.

[15] Gloria Hood, a therapist and the executive director of the Indiana Center for Children and Families, a subsidiary of Mental Health America of Indiana, testified that she became familiar with A.F., D.F., and M.F. when she was working at the Indianapolis Institute for Families in 2008 after their first removal from the parents' care, and that she began working with A.F. again in 2012 following another removal from her parents' home. She testified that she had been A.F.'s primary outpatient therapist since 2012.

[16] Hood testified that it would be important to be aware of a diagnosis for a child because it could influence a treatment plan. DCS's counsel asked Hood if A.F. came to her with any diagnosis, Father's counsel objected on the basis of hearsay, and the court overruled the objection. The following exchange then occurred:

> A I, I was aware that [A.F.] was evaluated by Dalton and Associates, and was given an, a diagnosis of reactive attachment disorder, this was in the, she didn't come with that, with that diagnosis, but in the course of treatment that was provided, as well as the attention deficit disorder. I think previous to that, she, it was mentioned in the Dalton and Associates report that there was . . .
>
> [Father's Counsel]: And, Judge, any testimony on the Dalton and Associates report I'm gonna object to it. It's hearsay. We don't have that report into the exhibits from DCS, so I'm gonna object as to, testifying as to that specific report from Dalton and Associates.

[GAL's Counsel]: Judge, she's the therapist, though, and this is information she's relying on and providing therapy.

THE COURT: Yeah, I'll allow it in.

A  Previous to the Dalton Associate report, Dalton Associates reported that there was a conduct disorder and, I, I just recall that they'd been talking about a conduct disorder . . .

[Father's Counsel]: Judge, I, I'm sorry to interrupt the witness again. Now she's reporting to what Dalton and Associates is reporting. If it's her understanding of what the, the diagnosis is, and that was her work with the child as the therapist, but now she's testifying as to what someone else reported as the diagnosis for the child.

THE COURT: And she's relying on that for treatment under . . . 803(4), so, I'm allowing it under that.

MS. HOOD: May I continue?

[DCS's Counsel]: Yes.

A  The purpose of my mentioning the conduct disorder was that the Dalton Associates' conclusion was that there was not a conduct disorder occurring, but that instead, it was reactive attachment disorder having to do with her instability in attachments and multiple transitions.

*Id.* at 161-162.

[17]     Hood testified that A.F. needed to be able to reside in a stable home and in a home where she does not anticipate frequent change in caregivers. Hood

testified that she observed A.F. experience emotional upset, including being sad, confused, and angry, before and after visitation. She recommended that visitation between Father and A.F. not occur.

[18] Hood testified regarding a letter from Father to A.F. in which Father told A.F. that he was no longer in prison, commented that he was sorry that he was taken away from them, expressed his love to the children, and that he wanted to see them. When asked why this letter was gone over during therapy, Hood testified without objection that this was a decision made during a Child and Family team meeting, that Father would be allowed to write letters to communicate to his daughters, and that these letters would be read only in therapy and processed in therapy. Hood testified that it was important for her treatment "[b]ecause of the emotional issues that she had had surrounding her father and contact with her father, it was important that, that she had assistance in dealing with any emotions when she discovered that he was no longer in, in jail or in prison." *Id.* at 171. The following exchange then occurred:

> Q How did she react from the letter from her father?
>
> A What I observed was a range of emotions, from crying to excited utterances.
>
> Q What do you mean by "excited utterances"?
>
> A She was . . . expressing . . . she was expressing her thoughts and her feelings with a change in tone, with emotional . . . there was a lot of emotional energy that she was expressing when she was reading this letter, and that she went back and forth between

that presentation and between tearful, crying, actual, actually sobbing, when she read this letter.

*Id.*

[19] Hood testified that she did not think it was important to try to rectify A.F.'s relationship with Father because there were other primary needs such as stability, permanency, and security of environment. She also expressed concerns if A.F. were to be reunified with Father such as the risks to her emotional stability and ability to form trusting relationships.

[20] Hood testified that D.F. exhibited behaviors that concerned her regarding visitation or parenting time with Father, including that D.F. had an emotional reaction to Father returning to prison. She recommended that Father not have parenting time with D.F. based on D.F.'s need for emotional stability and that "her emotional stability was . . . rather tenuous, and at risk if parenting time with her father would have been initiated . . . re-initiated." *Id.* at 180. She also testified that if D.F. was returned to Father's care she would be concerned for D.F.'s long-term ability to form secure attachments and to be able to have emotional calm and predictability in her life.

[21] Hood also testified that she was concerned with M.F.'s acting out and verbal displays of upset surrounding visitations with Father, and again recommended against parenting time for Father with M.F. She also testified that if M.F. were allowed to reunify with Father she would be concerned that it would be destructive to her emotional well-being and her future attachment potential.

[22] When asked why she supported adoption, Hood answered:

> I support that plan based on the, if my numbers are right this time, seven, approximately seven, years that they have been, had multiple transitions and I think it's time that they live in one home, stay in that home, reside in that home, not have fear that they will be removed from that home, and . . . I believe that this will be the best predictor of their future potential for positive emotional health, positive self-image and positive emotional, behavioral adjustment. Their ability to form future secure attachments will be based on whether they can have some security and, and the attachments that they currently have, and up to this point, they have not had that security and they're halfway through, they're almost halfway through their, their cycle of youth, and it's, it's time that they have, have that security.

*Id.* at 189-190.

[23] On cross-examination by GAL's counsel, Hood testified that A.F. was three or four when she first came to her, and that she would have explained "to any child at that . . . age, and that was that therapy was some place where she could come and we would help her with her feelings and we would help her with things that she was having trouble with." *Id.* at 190. She testified that over the course of therapy, A.F. understood that "this was someplace she was safe." *Id.* at 191. She also stated that she later had a more age-appropriate conversation with A.F. GAL's counsel stated that she had laid the appropriate foundation for Hood to say exactly how A.F. responded and what she said, Father's counsel objected and argued that A.F.'s statements would be hearsay, and GAL's counsel argued that she was moving to admit the statements under Rule

803(4) as statements made for purposes of medical diagnosis or treatment. The court clarified that the testimony related to the recent letter and not when A.F. was three years old and found that GAL's counsel had laid the foundation to allow the questioning. The following exchange then occurred between GAL's counsel and Hood:

Q  So could you state, exactly, how [A.F.] reacted upon receipt of those letters and what she said?

A  When [A.F.] read the letter, she did not know at that time that her father was no longer in jail or prison. She did not know that it was close to time for him to get out, so she was surprised and shocked initially. [A.F.], I think, I described a range of behaviors, and . . . initially, [A.F.] was very angry and she was angry because he was out of jail and she described that that meant that she had to worry about that he might go back to jail. She was angry remembering that he had promised not to go back to jail and had, indeed, broken that promise. So this was a trigger to her memory of promises that, she had described earlier, that her father had made to her. She . . . was very sad and this was part of her range of emotion because [A.F.] . . . does have a loyalty to her father and . . . part of her, I mean she really went from crying in anger to crying in sadness at being apart from her father, and in remembering . . . it was also a trigger to remembering the events that had caused them to be apart, including her observing domestic violence and the . . .

[GAL's Counsel]:  I'm gonna cut you off right there because I think we'll probably . . . draw an objection.

A  Okay. Okay.

Q At any point, did she exhibit her emotions over receipt of the letter in any other way? Through play therapy or art therapy, like you described she had participated in?

A [A.F.] did write a letter to her father. Wrote, wrote a response to, to her father.

*Id.* at 195-196.

[24] Later, GAL's counsel asked Hood if she had noticed any sexualized behaviors during her work with A.F., Hood answered that she had not directly observed sexualized behaviors but they had been reported to her by several persons, and Father's counsel objected on the basis of hearsay. GAL's counsel argued that it was not hearsay because Hood was a therapist and she was taking in information and using it in her treatment of the child, and the court allowed the testimony.

[25] Hood testified that she felt it would be beneficial for the children to know where they were going very soon because she had seen their emotional turmoil and related behavioral acting out. She testified that she expressed to Father that the children were fearful of him becoming incarcerated and they were dejected, angry, and sad because he went back to jail.

[26] Debbie Hale, a senior therapeutic support specialist, testified that she recommended parenting time for Father at one point, but subsequently recommended against it because of Father's inability to stay out of jail. During cross-examination, GAL's counsel asked why Hale would never recommend

that A.F. share a bedroom with one of her sisters, Hale answered "[b]ecause of her sexualized behaviors, because she has touched her sisters inappropriately," and Father's counsel objected and stated: "Calls for . . . this witness never clarified that she had personal knowledge of that information for [A.F.]. Calls for hearsay." *Id.* at 256. GAL's counsel responded that she was just asking for the basis of her recommendation, and the court overruled the objection.

[27] GAL Cavanaugh testified that her primary responsibility was to be the voice of the children. She testified that she did not recommend that the children be returned to Father or that he have overnights with them because she did not think Father ever fully completed services.

[28] During direct examination, GAL's counsel asked GAL Cavanaugh what M.F. told her, Father's counsel objected on the basis of hearsay, and the court stated: "I think she can summarize testimony, but, or the, what she said, but not verbatim." *Id.* at 332. The court then said: "Worst case, I'll let (inaudible). Being the Guardian ad Litem, that she's the voice of the child." *Id.* GAL's counsel asked GAL Cavanaugh to just summarize their wishes. GAL Cavanaugh testified that if it were possible for her to return to Mother, M.F. would like to do that, that if she could not be returned to her Mother, Father makes great pancakes and she would not mind living with him, that if those two things were not possible, then she feels loved by her foster parents and wants to be adopted. She testified that D.F. would like Mother and Father to reunite, and if that cannot happen, then she would like to live with Father, her uncle, and grandfather, and if that could not happen, then she would be happy being

adopted by her foster parents because she believes they love her, and that A.F. wants only to be adopted. She testified that the children had not had consistent parenting by Father over time and Father was not in a position to provide stability for his children and "I don't know, simply based on what I know, how much longer he would need in terms of more time to, at least, you know, make me as the Guardian ad Litem feel that he could do that." *Id.* at 335.

[29] GAL Cavanaugh testified that the children had been out of the care of their parents for so long, that it has affected them, and that she received training on trauma to children and trauma related to removal from parents. When asked whether she believed there was trauma in being removed and placed back with parents, Father's counsel objected on the basis of lack of foundation and stated: "We don't know what the training was that she has received related to trauma based on removal from the parents. I don't believe that we know what kind of expertise she could place on that question." *Id.* at 339. The court overruled the objection. GAL Cavanaugh answered that it "[k]eeps the children emotionally up and down, not knowing what's gonna happen next . . . ." *Id.* She also testified that it was in the children's best interests to be adopted and that she did not believe Father should be given more time to complete services. She stated that things would "go really well," parents would drop out of the picture, sometimes parents "would get incarcerated," the children would develop a routine and then it would have to stop through nothing that they had done on their own. *Id.* at 343. The children "would get sad" and mad, would want explanations from her as to why parents were allowed to just stop visiting or go

to jail.  *Id.* at 344.  When asked why she did not think giving Father more time would be in the best interests of the children, GAL Cavanaugh stated in part:

> That's part of the issue for me, is that they have been parented to consistently, in foster care or by the families that they're with right now, having them have to wait even more time to develop new relationships with, at least with, one person they don't know and a father who they haven't lived with for four or five years, I don't know what we're talking about in terms of when the children would be emotionally ready or safe to do that kind of thing, and the case has already gone on so long that, given part of my role to recommend a safe, secure, loving permanent placement as soon as possible, I, I don't feel like I could recommend more time.

*Id.* at 346.

On April 11, 2016, the court entered an order terminating Father's parental rights.  It concluded that continuation of the parent-child relationship posed a threat to the children's well-being, that there was a reasonable probability that the conditions that resulted in the removal and continued placement of the children outside the home would not be remedied, that there exists a reasonably probability that Father will not remain available in the future given his criminal history pattern of participating in services only to be incarcerated, that termination is in the best interests of the children, and that adoption is a satisfactory plan for the care and treatment of the children.

### *Discussion*

The issue is whether the court abused its discretion in admitting certain evidence. The admission of evidence is entrusted to the sound discretion of the juvenile court. *In re A.J.*, 877 N.E.2d 805, 813 (Ind. Ct. App. 2007), *trans. denied*. We will find an abuse of discretion only where the juvenile court's decision is against the logic and effect of the facts and circumstances before the court. *Id.* If a juvenile court abuses its discretion by admitting the challenged evidence, we will reverse for that error only if the error is inconsistent with substantial justice or if a substantial right of the party is affected. *In re S.W.*, 920 N.E.2d 783, 788 (Ind. Ct. App. 2010).

Father asserts that the trial court improperly admitted: (A) hearsay evidence; and (B) unqualified expert testimony.

### A.   *Hearsay*

Father contends that the trial court improperly admitted three types of hearsay: (1) testimony regarding the course of treatment of the children; (2) testimony as the basis for Hale's recommendation; and (3) testimony admitted through GAL Cavanaugh as the voice of the children.

Generally, "[a] hearsay statement is one 'other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.'" *VanPatten v. State*, 986 N.E.2d 255, 260 (Ind. 2013) (citing Ind. Evidence Rule 801(c)). Hearsay statements are not admissible, except pursuant to certain exceptions within the Rules of Evidence. *Id.* (citing

Ind. Evidence Rule 802). "[E]rrors in the admission of evidence are to be disregarded as harmless error unless they affect the substantial rights of a party." *Id.* at 267 (quoting *McClain v. State*, 675 N.E.2d 329, 331 (Ind. 1996); *citing* Ind. Trial Rule 61). "Admission of hearsay evidence is not grounds for reversal where it is merely cumulative of other evidence admitted." *Id.* (quoting *McClain*, 675 N.E.2d at 331-332).

### 1. *Course of Treatment*

[34] Father asserts that the court abused its discretion by admitting the testimony of the children's behavioral clinician, Tubbs, that she received reports from the foster home that A.F. was lying and stealing, and by admitting Hood's testimony that "she received a report from Dalton & Associates with information that A.F. had a reported conduct disorder but Dalton & Associates concluded A.F. had reactive attachment disorder," and that it had been reported to her that A.F. exhibited sexualized behaviors. Appellant's Brief at 10. Father also argues that the use of information for treatment purposes alone is not a recognized hearsay exception and that the statement must come from the person seeking diagnosis or treatment to qualify as an exception under Ind. Evidence Rule 803(4).

[35] As pointed out by DCS, A.F.'s foster mother, J.O., testified without objection that A.F. would steal and lie and that A.F. had "symptoms of, like, ADHD and RAD. She definitely had the re-attachment disorder." Transcript at 7. Further, she testified without objection that A.F. had sexualized behavior with

D.F. and that "[t]hey always wanna play 'house' or 'boyfriend, girlfriend,' or 'mom and dad,' and they would, like, hug each other and kiss each other, but not in a sisterly manner." *Id.* She also testified that when she would give the children baths she put them in the tub together because they were sisters and stated: "I'm washing one up and I look back and the other two have their toys making out. It, or . . . if I'm doing [A.F.], [D.F.] would be taking the toy, inserting it" and that she ended up separating bath time. *Id.* at 16-17. On cross-examination, she testified that she had to do safety planning around the sexualized behavior of the children, that they could not have bath time together, they could not sleep together, and they could not play with dolls that did not have clothes. Without a contemporaneous objection, Tubbs testified that A.F. "seemed to be over sexualized and more mature for her age." *Id.* at 77. Without objection, Hood testified: "I also have concerns because there's been sexual reactivity between these children, sexual acting out, and it would not be appropriate for them to, the three of them to be in a bedroom together for safety concerns." *Id.* at 188. Hale testified that she observed A.F. dancing suggestively and making sexualized comments, and that the children were "stripping dolls, prying their legs apart and looking in between them, um . . . looking at each other when they were undressed, and showing other signs of sexual behavior." *Id.* at 259. Thus, testimony which was cumulative of that evidence about which Father complains was admitted without contemporaneous objection. Accordingly, we cannot say the admission of the challenged testimony warrants reversal. *See Anderson v. Scott*, 630 N.E.2d 226, 232 (Ind. Ct. App. 1994) (observing that "[t]estimony which was cumulative of

that evidence about which the [appellants] complain was admitted without objection" and finding no basis for a reversal arising from the testimony), *trans. denied*; *Homehealth, Inc. v. Northern Ind. Public Serv. Co.*, 600 N.E.2d 970, 974 (Ind. Ct. App. 1992) ("Even if we could say that the admission of the exhibit was erroneous, and we decline to say so in this instance, the evidence contained therein was merely cumulative and therefore harmless."), *reh'g denied*.

[36] Father also asserts that Hood was improperly permitted to testify what A.F. said to her in response to Father's letter. Father concedes that the therapist told A.F. when she first started working with her in 2008 that therapy was a place where A.F. would come for help with her feelings, that A.F. came to understand that therapy was a safe place, and that when Hood started working with A.F. again in 2012, they again discussed that therapy was a place A.F. could express how she was feeling and that Hood was there to help her, but Father contends that A.F. did not understand the importance of being truthful with Hood for treatment purposes.

[37] DCS asserts that Father's argument is misplaced because, although Hood was asked to testify about what the child had said, she testified only about what she observed. DCS points out that when the therapist started to testify about what A.F. may have said, GAL's counsel asked the therapist to stop over concerns that the testimony may be moving towards hearsay.

We note that Hood testified without objection that A.F. reacted to Father's letter with a range of emotions and was tearful, crying, and sobbing. To the

extent Hood's testimony to which Father's counsel objected included testimony regarding what A.F. had said, we will address the merits of Father's argument.

[38] Ind. Evidence Rule 803(4) provides:

> The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness: (4) Statement Made for Medical Diagnosis or Treatment.  A statement that: (A) is made for--and is reasonably pertinent to--medical diagnosis or treatment; and (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause.

[39] This exception is grounded in a "belief that the declarant's self-interest in obtaining proper medical treatment makes such a statement reliable enough for admission at trial—more simply put, Rule 803(4) reflects the idea that people are unlikely to lie to their doctors because doing so might jeopardize their opportunity to be made well."  *VanPatten*, 986 N.E.2d at 260 (citing *White v. Illinois*, 502 U.S. 346, 356, 112 S. Ct. 736 (1992) ("a statement made in the course of procuring medical services, where the declarant knows that a false statement may cause misdiagnosis or mistreatment, carries special guarantees of credibility")).  Statements made to non-physicians may fall within Rule 803(4) if the statement is made to promote diagnosis or treatment.  *McClain*, 675 N.E.2d at 331.  In cases where there is a proper showing of reliability, a statement to a family therapist may be admissible pursuant to the medical diagnosis or treatment hearsay exception.  *Id.*

[40] This belief of reliability, though, necessitates a two-step analysis for admission under Rule 803(4). *Id.* "First, 'is the declarant motivated to provide truthful information in order to promote diagnosis and treatment,' and second, 'is the content of the statement such that an expert in the field would reasonably rely on it in rendering diagnosis or treatment.'" *Id.* (quoting *McClain*, 675 N.E.2d at 331).

[41] With respect to the first prong, the declarant's motive to promote treatment or diagnosis, "[t]he declarant must subjectively believe that he was making the statement for the purpose of receiving medical diagnosis or treatment." *Id.* (quoting *McClain*, 675 N.E.2d at 331). "With most declarants, this is generally a simple matter: '[o]ften, for example where a patient consults with a physician, the declarant's desire to seek and receive treatment may be inferred from the circumstances.'" *Id.* at 260-261 (quoting *McClain*, 675 N.E.2d at 331).

[42] In cases where the declarant is a child, the Indiana Supreme Court has acknowledged that such an inference may be less than obvious. *Id.* at 261 (citing *McClain*, 675 N.E.2d at 331). In *VanPatten*, the Court addressed statements made by the alleged victim, a six-year-old child, and held that "[s]uch young children may not understand the nature of the examination, the function of the examiner, and may not necessarily make the necessary link between truthful responses and accurate medical treatment." *Id.* "In that circumstance, 'there must be evidence that the declarant understood the professional's role in order to trigger the motivation to provide truthful information.'" *Id.* (quoting *McClain*, 675 N.E.2d at 331 (citing *U.S. v. Barrett*, 8

F.3d 1296, 1300 (8th Cir. 1993))).  This evidence does not necessarily require testimony from the child-declarant; it may be received in the form of foundational testimony from the medical professional detailing the interaction between him or her and the declarant, how he or she explained his role to the declarant, and an affirmation that the declarant understood that role.  *Id.* (citing *Barrett*, 8 F.3d at 1300).  But whatever its source, this foundation must be present and sufficient.  *Id.*  Appellate review of this issue is necessarily case-specific and turns on the facts and circumstances of each case as they are reflected in its record.  *Id.*  In *VanPatten*, the Court reviewed a spectrum of cases.

[43]    In *McClain*, for example, where a family therapist provided hearsay testimony under Rule 803(4) that a patient told her he had been molested, the Indiana Supreme Court held that the "requisite indicia of reliability" was missing.  *McClain*, 675 N.E.2d at 331.  "There [was] no evidence that the victim sought the therapist's help or that he believed he was receiving any treatment."  *Id.*  The declarant testified only that he knew his family therapist "was his 'counselor' and that he talked to her about what McClain did to him."  *Id.*  "Thus, the record [was] devoid of any evidence showing that the victim understood he was speaking to a trained professional for the purposes of obtaining diagnosis of, or providing treatment for, emotional or psychological injuries."  *Id.*

[44]    In *Cooper v. State*, a registered nurse provided hearsay testimony in the form of statements made to her by a child victim of sexual molestation during the

course of a physical examination. 714 N.E.2d 689, 690 (Ind. Ct. App. 1999), *trans. denied*. We affirmed the admission of the testimony. *Id.* at 691. In assessing whether the first prong of the *McClain* test was satisfied, we reviewed the foundational testimony provided by the nurse with respect to the interaction she has with children prior to those sorts of examinations and the specific interaction she had with the child victim in that case. *Id.* at 692-694. A few critical items of that testimony stood out to the court.

[45] With respect to the nurse's standard procedure, she testified that "we introduce ourselves to the child . . . and have the child get to know us," and "After you do the initial trying to get to know the child . . . generally I'll just take my time . . . just let them know who I am and who the doctor is . . . and then I'll start addressing the child, ask them if they know why they're in the emergency room." *Id.* The State specifically asked the nurse: "When you're dealing with the child, you tell them who you are and what your job is?" *Id.* The nurse responded that "I usually tell them my name is Kim and I'll be their nurse and I'll be with them the whole time . . . [l]et them know what they are going to expect, what the doctor is going to do, and that it's okay for the doctor and nurse to take a look at them." *Id.*

[46] With respect to the victim in *Cooper*, the nurse testified that she followed that same procedure, and that she let the victim know that "[h]er mom brought her in because of something, and if she's going to tell me what that something is when she feels comfortable to talk to me about it." *Id.* at 693. She said "I asked her if she knew why she was there in the emergency room, and I believe she

thought she was going to get an exam. She needed to get examined, but she didn't know why." *Id.* at 694. Only after that introduction was made did the victim make substantive statements to the nurse as to the nature of the molestation and the perpetrator. *Id.*

[47] Taken together, the court in *Cooper* held that the testimony provided a proper foundation for the admission of the nurse's testimony under Rule 803(4). The victim "knew that she was in the emergency room for an examination by a physician because of the molestation by Cooper. [She] sufficiently understood the professional role of both the nurse and the doctor who examined her, thus triggering the motivation to provide truthful information." *Id.* at 694.

[48] Later, in *In re W.B.*, two parents appealed the termination of their parental rights with respect to their two young children. 772 N.E.2d 522, 524 (Ind. Ct. App. 2002). A factor in the termination decision was a finding by the trial court that the children were subjected to sexual and physical abuse by the parents—a finding based entirely on hearsay testimony provided by a therapist who relayed statements made to her by the children. *Id.* at 532. The court found that the testimony failed the first prong of the *McClain* test because the record was "devoid of any evidence . . . that the children, in making these statements, were 'motivated to provide truthful information in order to promote diagnosis and treatment.'" *Id.* at 533 (quoting *McClain*, 675 N.E.2d at 331). The court highlighted that it "clearly portrayed the young children as mentally and emotionally incompetent, and no doubt totally unaware of [the therapist's] professional purpose." *Id.*

[49] Finally, in *In re Paternity of H.R.M.*, a father appealed a modification of his visitation rights that was based largely on hearsay testimony of sexual abuse given by a clinical social worker. 864 N.E.2d 442, 444-445 (Ind. Ct. App. 2007). The court reviewed the analysis in *McClain*, *W.B.*, and *Cooper*, and found that "the record contain[ed] no indication that H.R.M. had the requisite motivation to tell the truth, as no evidence indicates that she knew [the social worker's] role or that she was being interviewed for the purpose of medical diagnosis." *Id.* at 447.

[50] After reviewing those cases, the court in *VanPatten* examined the record and held: "the question before us is whether the record reflects that the child adequately understood the role of the medical professional and the purpose of the visit in order for us to infer that the child was motivated to speak truthfully." *VanPatten*, 986 N.E.2d at 265. It observed that the only statements relevant to the first prong of the *McClain* test were the nurse's statement that she tells children "[i]t's my job to make sure that you're okay," and her affirmative response to the question "[s]o you ask general health issues and you also talk to them about why you're there to see them and provide treatment to them?" *Id.* at 266. It also observed that the nurse had no actual recollection of her conversations with the children and it could not tell how the children responded or whether they understood what was going on. *Id.* at 266-267. The court observed that the nurse expressly said that "she would *not* have explained to the girls how important it is that they tell her the truth." *Id.* at 267.

[51] The court stated:

We do not intend for this evidentiary foundation to present an insurmountable hurdle, nor do we seek to dictate trial testimony. But here, for example, a few simple questions asked of E.R. and S.D. would have helped: "Have you been to a doctor's office before?" "Have you been seen by a nurse before?" "Do you know what nurses do?" "What do they do?" "Do you know the difference between the truth and a lie?" "Do you tell nurses and doctors the truth?" "Do you know why you tell the nurses and doctors the truth?" "Did you know why you were seeing Nurse Moss?" Firm responses to questions like these would go a long way in supporting the inference that E.R. and S.D. were motivated to tell Moss the truth when she examined them.

Likewise, a few more directed questions for Moss would have been helpful (although given her lack of precise knowledge about her interactions with E.R. and S.D., we concede that these would have been difficult in this particular case): "Did you explain the purpose of the examination to the girls?" "How so?" "Did you ask if they understood the purpose of the examination?" "Did you ask if they had been seen by a nurse before?" "Did you explain how important it was that they tell you the truth?" "How did they respond?" These sorts of questions—and solid responses—reflected in the record would certainly help a reviewing court confirm that the hearsay testimony sought to be admitted was sufficiently reliable.

Along those same lines, a few simple questions asked of E.R. and S.D.—or their parents—could have clarified the purpose of the visit in the first place. "Why were you seeing Nurse Moss?" "Did the police ask you to take your daughter to the Sexual Assault Treatment Center?" "Why did you take your daughter there?" "Why not take her to a hospital before taking her to DCS?" This sort of evidentiary foundation would certainly ameliorate our concern that the visit was intended to obtain evidence as part of a law enforcement investigation.

*Id.* at 266.

[52] Here, on cross-examination by GAL's counsel, Hood testified that A.F. was three or four when she first came to her, and that she would have explained "to any child at that . . . age, and that was that therapy was some place where she could come and we would help her with her feelings and we would help her with things that she was having trouble with." Transcript at 190. The following exchange occurred:

> Q Okay. Was that type of conversation what you would think would be developmentally appropriate for a child at that age?
>
> A Yes.
>
> Q Okay. Did she exhibit to you that she understood that it was a safe place where she was coming where you could help her?
>
> A At that time, [A.F.], I think over the course of time [A.F.] did, I don't, I don't believe on the intake that [A.F.] understood what that meant.
>
> Q Okay. How-
>
> A But, over the course of therapy, I, I believe that she understand that this was someplace she was safe.

*Id.* at 190-191.

[53] GAL's counsel then asked Hood about the more recent treatment of A.F.:

Q  Okay, and then when you most recently started working with [A.F.] again, was there any additional talk about your role as her therapist?  Between you and [A.F.].

A  Yes, a similar description . . . with a little bit more age-appropriate with, with again, age-appropriate conversation about that therapy is a place where you can express how you're feeling, what you're thinking and where we can work together to solve problems and help with how life is going for you.

Q  Is there any conversation about the importance of being truthful in therapy?

A  Certainly.

Q  Do you recall any specifics about those conversation [sic]?

A  Well, one of . . . [A.F.], as with many children, did have difficulty, at times, with truthfulness.  And so, as reported by her foster mother, and so it . . . the difference between what is the truth, what is a lie is important to discuss with the child.

Q  Did you discuss, though, the importance of being truthful in a therapeutic setting?

A  The way that I discuss that with children is to talk about them feeling safe, and not feeling fearful.  Not needing to say something that I want to hear or what that they think I want to hear.  Being able to talk about how they are experiencing life, how they ex- are experiencing even the setting of, of therapy.  To be able to talk about that and, and to reduce any fear that they might have, um . . . assist children to be truthful and open, what I could call, "open," in a therapy session.

Q And then, in this most recent session, had you communicated to [A.F.] that you were there to help her?

A Yes, most definitely.

Q You described a little bit on direct examination about [A.F.'s] response when she received the letter from her father.

A Yes.

Q I believe I've now laid the appropriate foundation that would allow you to say exactly how she responded and what she said, so could you tell the Court that, please?

Father's Counsel then objected and GAL's counsel responded in part that "Statements to a therapist can certainly be included, as long as the child understands she's there for therapy." *Id.* at 194.

The record reveals that A.F. was born in September 2005 and that Hood went over Father's letter with her in October 2015 when she was ten years old. Based upon the testimony, A.F. understood she was someplace safe, and Hood explained that therapy was where they could work together to solve problems and that she was there to help her. Under the circumstances, we cannot say the trial court abused its discretion in admitting A.F.'s statements to Hood pursuant to Rule 803(4).

### 2. *Basis for Recommendation*

Father argues that the trial court abused its discretion by admitting the testimony of Hale, the foster home therapeutic support specialist for the

children, that A.F. had touched her sister inappropriately. DCS argues that the statement was not offered for the truth of the matter and was offered as the basis why the witness would not recommend the children share a bedroom.

[56] As noted, testimony from J.O., Tubbs, and Hood, to which Father's counsel did not object, addressed the sexualized behavior of A.F. Even assuming that Hale's testimony to which Father objected was admitted for the truth of the matter asserted, we cannot say that the admission warrants reversal. *See Anderson*, 630 N.E.2d at 232; *Homehealth, Inc.*, 600 N.E.2d at 974.

### 3. *Voice of the Children*

[57] Father argues that the trial court abused its discretion by allowing GAL Cavanaugh to summarize and testify to what the children had said because she was the voice of the children. He asserts that there is nothing about the role of the guardian ad litem that creates an exception to the hearsay rule prohibiting testimony about out-of-court statements and that summarizing out-of-court statements is no less hearsay than repeating the statements verbatim.

[58] DCS argues that it appears Father acquiesced to the GAL providing the summaries because he objected only when it appeared that the GAL was going to testify to one child's specific statement, and that Father waived his argument because he raised it for the first time on appeal.

[59] We note that Father did not object following the trial court's statement that GAL Cavanaugh could summarize but not repeat what the children said

verbatim. Further, as pointed out by DCS, GAL Cavanaugh testified that A.F. indicated that she wants only to be adopted but that M.F. would not mind living with Father if that was a possible option, and that D.F. would like to live with Father if Mother and Father could not reunite. Thus, two of the three children indicated that they would live with Father. Under the circumstances and in light of the other evidence including Father's multiple incarcerations, the recommendation of FCM Fahnbulleh that placement and adoption was in the children's best interests, and Hood's support for the adoption plan, we cannot say that reversal is warranted.

B.    *Expert Testimony*

[60]    Father contends that the trial court abused its discretion by admitting GAL Cavanaugh's testimony that there was trauma to the children from being removed from their parents, placed back with parents, and removed again. He cites Ind. Evidence Rule 702, which governs the admission of expert testimony, and asserts that the testimony did not establish that the GAL was an expert and there was no evidence of what scientific principles the GAL's testimony about trauma to the children rested upon, much less that it was reliable.[2]

---

[2] Ind. Evidence Rule 702 is titled "Testimony by Expert Witnesses" and provides:

> (a) A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.
>
> (b) Expert scientific testimony is admissible only if the court is satisfied that the expert testimony rests upon reliable scientific principles.

[61] DCS argues that Father's argument is misplaced because counsel did not tender GAL Cavanaugh as an expert witness nor did the court qualify her as an expert. DCS also asserts that even assuming that the trial court erred, there was independent evidence of the trauma the children suffered.

[62] Father's counsel did not specifically mention Rule 702 at the hearing; rather, counsel stated: "Objection, Judge. Lack of foundation. We don't know what the training was that she has received related to trauma based on removal from the parents. I don't believe that we know what kind of expertise she could place on that question." Transcript at 339.

[63] A lay witness may testify as to opinions or inferences which are rationally based on some combination of the witness's own personal observation, knowledge, and past experience. *See* Ind. Evidence Rule 701.[3] GAL Cavanaugh testified that she served as a guardian ad litem for more than sixteen years, that she was assigned as the guardian ad litem for the children, and that she observed the children and spoke with them individually. Without objection, GAL Cavanaugh testified that she recommended that phone contact be suspended based upon things the children said during a visit, including that M.F. was very confused about the contact because she did not remember Father and A.F. was not comfortable with the phone calls. She also testified that she recommended

---

[3] Ind. Evidence Rule 701 provides: "If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; and (b) helpful to a clear understanding of the witness's testimony or to a determination of a fact in issue."

the plan change to adoption in December 2014 because Father had not completed services and the children had unstable parenting for many years. She testified that she received training on trauma and following the objection of Father's counsel based upon lack of foundation and the court's overruling of the objection, GAL's counsel asked: "Do you believe that there is any trauma involved, speaking of these children in particular, because of their living with parents, being removed, living with parents; the cycle that they've been through?" Transcript at 339. GAL Cavanaugh answered: "Keeps the children emotionally up and down, not knowing what's gonna happen next . . . ." *Id.* We conclude that GAL Cavanaugh's opinion was rationally based on her personal observation, knowledge, and past experience, and thus that the court did not abuse its discretion when it admitted her testimony that the children suffered trauma.

## *Conclusion*

[64] For the foregoing reasons, we affirm the termination of Father's parental rights.

[65] Affirmed.

Robb, J., and Mathias, J., concur.