## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 30 2017, 9:22 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of B.J.R., Mother, J.F., Father, and M.R., Minor Child, | May 30, 2017 |
| | Court of Appeals Case No. 21A04-1701-JT-104 |
| B.J.R., | |
| *Appellant-Respondent,* | Appeal from the Fayette Circuit Court |
| v. | The Honorable Beth A. Butsch, Judge |
| Indiana Department of Child Services, | Trial Court Cause No. 21C01-1606-JT-205 |
| *Appellee-Petitioner.* | |

**Kirsch, Judge.**

[1] B.J.R. ("Mother") appeals the juvenile court's order terminating her parental rights to her child, M.R. ("Child").[1] On appeal, Mother raises the following restated issues:

I. Whether the juvenile court abused its discretion when it denied Mother's motion for a continuance of the termination hearing; and

II. Whether the judgment terminating Mother's parental rights was clearly erroneous because it was based on insufficient evidence.

[2] We affirm.

## Facts and Procedural History[2]

[3] We begin by noting that, throughout the proceedings relevant to this case, the location of Child's father, J.F. ("Father"), was unknown. Mother and Father are the biological parents of Child, who was born July 30, 2004. On or about December 5, 2014, the Indiana Department of Child Services ("DCS") received a report that Child was living with Mother, who had been admitted the previous day to Options Behavioral Health ("Options") due to "suicidal

---

[1] The juvenile court terminated the parental rights of Child's mother and father. While father does not participate in this appeal, pursuant to Indiana Appellate Rule 17(A), a party of record in the trial court shall be a party on appeal.

[2] Like the juvenile court, we rely on: (1) testimonial and documentary evidence from the CHINS proceedings, cause number 21C01-1412-JC-333; and (2) Mother's criminal proceedings under cause number 21C01-1501-F4-90, both of which the juvenile court took judicial notice. *Appellant's App.* at 7 n.2. Because Child's father does not appeal, we set forth only the facts pertinent to Mother.

intentions with a plan to overdose on heroin." *DCS Ex.* 1 That report also stated: (1) Mother used 3.5 to 5 grams of heroin per day; (2) Mother used "Subutex and Klonopin, but sold most of the pills to pay for heroin"; (3) Child smoked cigarettes every day, all day long; (4) Mother began giving Child cigarettes as a reward at the age of four years old, and Mother continued to buy them and even roll them for Child; (5) Mother was Child's sole caregiver; and (6) Mother had been admitted more than once to Options to address problems with heroin addiction. *Id.* at 1-2. Based on this report, Child was removed from Mother's care.

[4] On December 15, 2014, DCS filed a petition alleging that Child was a child in need of services ("CHINS"). In addition to the above factors, the CHINS court learned: (1) Mother had been using heroin for the prior two months; (2) Mother's heroin addiction was affecting "many lives, including her ability to parent"; (3) Mother took heroin daily by "IV"; (4) Mother had personal property and prescriptions stolen from her home; (5) Mother admitted to "dealing drugs" in the past; and (6) Mother said she needed "2 to 3 months to 'get her head straight.'" *Id.* at 2. As part of the petition, DCS informed the CHINS court that, in December 2014, Mother and Child's maternal grandmother ("Grandmother") agreed with DCS to a "safety plan" that provided: (1) Grandmother would supervise Mother and Child at all times, and if Mother appeared under the influence of drugs or tried to take Child away, Grandmother would call law enforcement; (2) Grandmother and Mother would keep Child safe and meet her basic needs; and (3) Grandmother and Mother

agreed that Child would stay with Grandmother throughout the DCS investigation. *Id.* Two days after agreeing to the safety plan, Mother said she wanted to take Child home and "wanted out of the safety plan." *Id.*

[5] The CHINS petition also contained the following information obtained by a family case manager during a DCS follow-up visit to Grandmother's home: (1) Grandmother allowed Child to have a couple of puffs of a cigarette to combat symptoms from Child's nicotine withdrawal; (2) Mother admitted she could not supervise Child enough to keep her from smoking; (3) Grandmother has health problems and admitted she cannot control Child at times and cannot care for Child on a long-term basis; and (4) Mother intended to "give" Child to Grandmother or an uncle to "get DCS out of our lives." *Id.* at 2-3. Following a detention hearing, the CHINS court ordered that Child remain in DCS's care while awaiting a fact-finding hearing on the CHINS petition.

[6] On January 28, 2015, Mother was arrested and charged with dealing in a narcotic drug in the presence of a minor and taking a minor to a common nuisance.[3] Mother pleaded guilty to both counts and was sentenced to concurrent sentences with an aggregate executed term of eight and a half years. Mother's sentence was affirmed on appeal. Accordingly, Mother has been incarcerated since her January 2015 arrest.

---

[3] Child was not the minor referenced in Mother's criminal charges.

[7] About two weeks after Mother's arrest, the CHINS court held a fact-finding hearing. Based on Mother's admission, Child was adjudicated a CHINS.[4] The CHINS court issued a dispositional order in March 2015, finding that Child's needs included, "appropriate medical, dental, educational, and mental health services." *DCS Ex.* 4. The CHINS court ordered Mother to participate in the plan of care necessary to ensure Child's safety and well-being and granted wardship of Child to DCS, with the permanency plan of reunification. *Id*.

[8] On June 3, 2015, the CHINS court held a review hearing and found that DCS had complied with the case plan. The court recognized that Mother, while incarcerated, had visited with Child on two or three occasions. *DCS Ex.* 5. DCS had offered Mother "therapy and substance abuse services" prior to her incarceration and had contacted a service provider to "determine the level of services Mother [could] be provided while . . . incarcerated." *Id*. However, Mother did not comply with the case plan, did not cooperate with DCS, and did not "enhance her ability to fulfill her parental obligation." *Id*. Additionally, the "cause of [Child]'s out-of-home placement or supervision had not been alleviated due to Mother's incarceration." *Id.* On December 2, 2015, the CHINS court held a permanency hearing and changed Child's permanency plan to reunification with a concurrent plan of adoption. *DCS Ex.* 6.

---

[4] Although Mother was incarcerated throughout most of the CHINS proceedings, she appeared by telephone or in person at each CHINS of the hearings.

[9] On May 25, 2016, the CHINS court held a review hearing. *DCS Ex.* 7. At that time, Mother's projected release date was June 2021. *Id.* During that hearing, DCS reported that an Interstate Compact on the Placement of Children, requesting a potential placement of Child with relatives in Kentucky, had been denied. DCS also reported that DCS was unable to provide Mother services due to her incarceration in the DOC. *Id.* at 1, 2.

[10] On June 17, 2016, DCS filed a petition for termination of parental rights ("TPR"), and a TPR fact-finding hearing was held on November 18, 2016. At the start of that hearing, Mother's counsel made an oral motion for a continuance on the basis that the adoption plan for child was premature because DCS was still looking for permanent placement with family members. *Tr.* at 13. DCS objected, stating "DCS does not need to know specifically where a child will be as long as we can establish that the permanency plan uh, is being [] sought." *Id.* at 14. Addressing the motion, the juvenile court, off the record, obtained and reviewed Child's CHINS records and denied Mother's motion for a continuance. The juvenile court noted that Child had been removed from Mother's care for almost two years, and that it was the recommendation of DCS and Child's court appointed special advocate that the case proceed to termination proceedings. *Id.* The juvenile court concluded, "[T]here has been more than ample time for [] the child's mother to identify if there are any people potential placements and relatives for [Child]." *Id.* at 15.

[11]     Three witnesses testified at the TPR hearing, Mother, DCS family case manager Anna Maria Lankford ("FCM Lankford"), and Child's court appointed special advocate Michelle Richardson ("CASA Richardson"). The following evidence was presented during the TPR hearing. In 2013, Mother voluntarily sought treatment at Options due to having suicidal thoughts and ongoing substance abuse issues. *Tr.* at 35. FCM Lankford testified that Mother successfully completed the program, but just prior to DCS's involvement, she relapsed on heroin. *Id.* Mother returned to Options, but "she later checked herself out before completing those services." *Id.* Approximately one month prior to her arrest, DCS referred Mother to therapy and substance abuse treatment at Centerstone and to Lifeline Services to oversee Mother's visitation with Child. *Id.* at 27. FCM Lankford testified that, although Mother used "visiting supervised parenting time," she did not "set up for the substance abuse treatment." *Id.*

[12]     FCM Lankford testified that Mother had been incarcerated since her January 28, 2015 arrest on drug-related charges and that Mother "admitted to um, professionals, that she has had an ongoing substance use factor since approximately age 14." *Id.* at 20. While at the Fayette County Jail, Mother completed a parenting class and a 12-week substance abuse program. *Id.* at 27-28, 44-45. Mother also had a "few visits" with Child. *Id.* at 31. Later in 2015, Mother pleaded guilty to dealing in a narcotic drug, a Level 4 felony, and taking a minor to a common nuisance, a Class A misdemeanor. Mother's sentence of eight and a half years was affirmed on appeal. FCM

Lankford testified, "At this time, the earliest possible release date is June of 2021."[5]  *Id.* at 24.  FCM Lankford also testified that Mother is "not able to care for her child or participate in parenting time with her child based on her incarceration[]."  *Id.* at 31.

[13]  Regarding Child, FCM Lankford testified that Child has mental health needs, and she has been placed in residential treatment and in numerous foster homes.  *Id.* at 22.  Child has had behavioral issues in the home and at school.  *Id.*  On August 27, 2015, Child was placed in Courage Center, a residential facility.  *Id.*; *DCS Ex.* 6.  While the record is unclear as to when Child was released from that facility, she was placed in a therapeutic foster home on May 19, 2016.  *DCS Ex.* 7.  At the time of the termination hearing, Child was staying with Grandmother in order to provide the therapeutic foster home "rest care."  *Tr.* at 26.

[14]  FCM Lankford testified that Child had made a lot of progress within the six months prior to the TPR hearing, compared with the progress made during the initial year and a half.  *Id.* at 22.  However, Child still had behavioral issues and ongoing mental health needs.  *Id.*  FCM Lankford testified that DCS was recommending termination because Mother's continued use of illegal substances poses a safety risk to Child, and Child struggles with her own behavioral and mental health issues.  *Id.* at 19-20.  FCM Lankford

---

[5] Mother disagrees with FCM Lankford's estimate and testified at the TPR hearing that she was anticipating being released in December 2018.  *Reply Br.* at 3 (citing *Tr.* at 41).

testified that Mother has been previously incarcerated for substance abuse, has sought treatment, and has relapsed. *Id*. at 24.

[15] CASA Richardson testified that Mother is unable to care for Child because she cannot create and maintain a stable and safe environment for Child. *Id*. at 37. Mother also cannot parent due to her incarceration. *Id*. CASA Richardson believed that Mother and Child love each other, yet it was still in Child's best interest that Mother's parental rights be terminated. *Id*. CASA Richardson testified that Child is "very special," and "she needs a permanent home so she can grow and so she can get the services that she needs." *Id*. CASA Richardson stated that Child is only twelve years old, "has a long hard road ahead of her," and needs stability. *Id*.

[16] On December 9, 2016, the juvenile court issued its order terminating Mother's parental rights. *Id*. at 75-83. Mother now appeals.

## Discussion and Decision

## I. Motion to Continue

[17] Mother contends the juvenile court abused its discretion in denying her motion for a continuance, which she presented at the start of the TPR hearing. Mother reasons that if she had been provided additional time, she could have located a family member to care for Child, thereby negating the need for termination of her parental rights. *Appellant's Br*. at 26-27. Under the trial rules, "a trial court shall grant a continuance upon motion and 'a showing of good cause established by affidavit or other evidence.'" *Gunashekar v. Grose*, 915 N.E.2d

953, 955 (Ind. 2009) (citing Ind. Trial Rule 53.5). Generally speaking, a trial court's decision to grant or deny a motion to continue is subject to abuse of discretion review. *In re K.W.*, 12 N.E.3d 241, 243-44 (Ind. 2014). "An abuse of discretion may be found in the denial of a motion for a continuance when the moving party has shown good cause for granting the motion, but no abuse of discretion will be found when the moving party has not demonstrated that he or she was prejudiced by the denial." *Id.* (internal quotation marks omitted).

[18]   Good cause is determined based on "the circumstances present," "particularly in the reasons presented to the trial judge at the time the request was denied." *F.M. v. N.B.*, 979 N.E.2d 1036, 1040 (Ind. Ct. App. 2012) (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)). Here, Mother's stated basis for requesting a continuance was that DCS was still considering other "permanency places" for Child to be with family. *Tr.* at 13. We note that the juvenile court did not immediately deny Mother's request for a continuance; instead, the judge went off the record, obtained the underlying CHINS case, and reviewed it. In denying Mother's motion, the juvenile court calculated that Child had been removed from Mother's care for almost two years. The court then noted that in the CASA's most recent report, which was filed with the court two days prior to the TPR hearing, CASA Richardson stated she agreed with DCS's determination that "this case proceed to the termination of parental rights." *Id.* at 14-15. The juvenile court determined that there had been "ample time" for Mother "to identify if there are any . . . potential placements and relatives" for Child. *Id.* at 15.

[19]    Mother contends that FCM Lankford's testimony at the TPR hearing—that DCS "is diligently searching for relative option care"—reflects it was premature to terminate her parental rights. *Appellant's Br.* at 27 (citing *Tr.* at 22). Mother asserts that she has been prejudiced by the denial of the continuance because, had one been granted, and Mother's relatives were deemed to be appropriate as Child's guardian, the juvenile court would have had no legitimate basis for terminating Mother's parental rights. *Id.* We disagree.

[20]    Here, the CHINS court approved Child's removal from Mother around December 15, 2014, based on Mother's inability to care for Child due to her drug abuse. In January 2015, a time when Mother should have known her actions would be scrutinized, Mother sold drugs to an undercover police officer and was arrested, charged, and placed in jail. *Tr.* at 20. In August 2016, Mother requested, and the juvenile court granted Mother a continuance, which delayed the TPR fact finding from November 4 to November 18, 2016. *Appellant's App.* at 18.[6] Mother did not file another motion for a continuance until the morning of the fact-finding hearing. We are not persuaded that Mother was prejudiced by the denial of her motion. Here, it was Mother's own actions that supported the termination of her parental rights. The juvenile court did not abuse its discretion when it denied Mother's motion for a continuance.

---

[6] For ease of reference, we refer to volume two of Mother's appendix as "*Appellant's App.*"

# II. Termination of Parental Rights

[21] Mother argues that the judgment terminating her parental rights was clearly erroneous because it was based on insufficient evidence. "The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re J.W., Jr.*, 27 N.E.3d 1185, 1187-88 (Ind. Ct. App. 2015), *trans. denied*. "However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination." *Id*. at 1188. Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. *Id*. "Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities." *Id*.

[22] Before an involuntary termination of parental rights may occur, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).[7]  DCS's burden of proof for establishing these allegations is one of clear and convincing evidence.  *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1230 (Ind. 2013).  If the court finds that the allegations in a petition described in section 4 of this chapter are true, the trial court shall terminate the parent-child relationship.  Ind. Code § 31-35-2-8(a).

[23]  When reviewing a termination of parental rights issue, our court will not reweigh the evidence or judge the credibility of the witnesses.  *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016).  We consider "only the evidence and any reasonable inferences therefrom that support the judgment," and give "'due regard' to the trial court's opportunity to judge the credibility of the witnesses firsthand."  *K.T.K.*, 989 N.E.2d at 1229.  Here, in terminating Mother's parental rights to Child, the juvenile court entered specific findings and conclusions.  When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review.  *In re R.S.*,

---

[7] Mother does not challenge the juvenile court's conclusion that Child had been removed for the requisite period of time under Indiana Code § 31-35-2-4(b)(2)(A).

56 N.E.3d at 628.  First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id*.  We will set aside the trial court's judgment terminating a parent-child relationship only if it is clearly erroneous, *i.e.*, if the findings do not support the trial court's conclusions or the conclusions do not support the judgment.  *Id*.  If the evidence and inferences support the judgment, we must affirm.

### A. Findings of Fact

[24]   In its December 9, 2016 order terminating Mother's parental rights to Child, the juvenile court entered findings of fact and conclusions thereon.  Regarding the findings, Mother challenges only Finding 17, which stated, "Mother's earliest scheduled release date is June 2021." *Appellant's Br*. at 17; *Appellant's App*. at 11.  Mother contends that this date was only supported by the testimony of FCM Lankford.  *Appellant's Br*. at 17 (citing *Tr*. at 24).  Mother argues that, in light of both her testimony that she would be released in December 2018, and FCM Lankford's testimony on cross examination that there was a "possibility" that Mother would be released sooner, it was error for the juvenile court to find that Mother's earliest release date was June 2021.  *Appellant's Br*. at 17-18.  We disagree.  The juvenile court was presented with two different dates.  FCM Lankford stated, without qualification, that the earliest release date was June 2021.  Mother, however, qualified her own answer.  When counsel asked how she "arrive[d] at" the date of December 2018, Mother stated, "I'm eligible for . . . up to two years in time cuts and um, since this being my first felony in the State of Indiana *I should be able to* pull for a CTP at the time of the

completion of the programs that I do." *Tr.* at 41 (emphasis added). Under the clearly erroneous standard of review, reversal is only appropriate if an appellate court finds that the trial court's decision is "against the logic and effect of the facts and circumstances before the court." *Matter of A.F.*, 69 N.E.3d 932, 942 (Ind. Ct. App. 2017). Here, FCM Lankford specifically testified that the earliest release date was June 2021, while Mother testified that she *should be able to* obtain a release date of December 2018. It was not clearly erroneous for the juvenile court to find that the only certain date, was the earliest release date. Because Mother challenges only Finding 17, the remaining findings stand as proven. *See McMaster v. McMaster*, 681 N.E.2d 744, 747 (Ind. Ct. App. 1997) (accepting as true trial court findings that appellant did not challenge).

## B. Conclusions

[25] Mother challenges the juvenile court's conclusions that: (1) there is a reasonable probability that: (a) conditions that resulted in the removal of Child or the reasons for placement outside Mother's home will not be remedied; and (b) continuation of the parent-child relationship poses a threat to the well-being of Child; (2) termination was in the best interests of Child; and (3) that there is a satisfactory plan for the care and treatment of Child.

### 1. Conditions not Remedied

[26] Mother contends that DCS failed to prove by clear and convincing evidence that the conditions resulting in Child's removal will not be remedied. In determining whether there is a reasonable probability that parents will not

remedy the conditions resulting in their child's removal from home, a trial court engages in a two-step inquiry. First, the court must "ascertain what conditions led to [the child's] placement and retention" outside a parent's care. *In re K.T.K.*, 989 N.E.2d at 1231. Here, Mother admits that Child was removed from her home due to her drug use and her arrest and incarceration on the drug charges for which she ultimately was convicted in December 2015. *Appellant's Br.* at 19. Child was not returned to Mother, who remained incarcerated throughout the CHINS and TPR proceedings.

[27] Second, the court must determine whether a reasonable probability exists that the conditions justifying a child's continued "placement outside the home will not be remedied." *In re D.D.*, 804 N.E.2d 258, 266 (Ind. Ct. App. 2004) (citing *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*), *trans. denied*. To make that determination, the trial court must judge a parent's fitness to care for her child as of the time of the termination hearing, taking into consideration evidence of changed conditions. *In re S.P.H.*, 806 N.E.2d 874, 881 (Ind. Ct. App. 2004). A parent's habitual patterns of conduct must also be evaluated to determine the probability of future negative behaviors. *K.T.K.*, 989 N.E.2d at 1234. DCS need not rule out all possibilities of change; rather, it must establish that there is a reasonable probability that the parent's behavior will not change. *In re B.J.*, 879 N.E.2d 7, 18-19 (Ind. Ct. App. 2008), *trans. denied*.

[28] Mother argues that there is no evidence indicating that her addiction impaired her ability to care for Child, but even so, she engaged in programs while incarcerated, and at the time of the termination hearing, she had remedied her

addiction. *Appellant's Br*. at 19-20. We recognize that a court must consider the conditions at the time of the fact-finding hearing; however, a parent's habitual patterns of conduct must also be evaluated to determine the probability of future negative behaviors. *K.T.K.*, 989 N.E.2d at 1234.

[29] Mother admitted that she had used alcohol and drugs since the age of fourteen, and Mother had a history of using illegal substances, engaging in treatment, and then relapsing. *Tr*. at 20, 35; *DCS Ex*. 3. Mother had an older child, M., who was eighteen years old at the time of the TPR hearing. *Tr*. at 50. M. was raised by Mother's aunt and uncle. *Id*. Mother testified at the fact-finding hearing that, when M. was born, Mother was drinking and was not mature enough to take care of M. *Id*. Mother explained that she was still part of M.'s life, but M., by living with aunt and uncle, did not have to see "the drinking and stuff I was involved in at the time and the things that I've done." *Id*.

[30] About sixteen years after M. was left in the care of her aunt and uncle, Mother still had a problem with substance abuse. Mother lived in Connersville, but "admitted buying seven grams of heroin daily from Dayton, Ohio, and Mother would then use five of those grams herself and sell the other two grams in her community." *Appellant's App*. at 11; *Tr*. at 52. In January 2015, Child had been out of Mother's care for more than a month, Mother knew that a CHINS petition had been filed, and yet she continued to use drugs and was caught dealing heroin. Mother used "Subutex and Klonopin, but sold most of the pills to pay for heroin." *DCS Ex*. 1. Mother had first given Child cigarettes as a reward at age four, and at age ten, Child was so addicted that Grandmother

allowed Child to "have a couple of puffs from a cigarette to combat the Child's nicotine withdrawal symptoms." *Id*. at 2. Mother's habitual pattern of conduct suggests that there is a reasonable probability that she will not remain clean once released.

[31] Additionally, Mother will be unable to remedy conditions with Child until Mother is released from incarceration, likely in June 2021 when Child will be a month shy of her seventeenth birthday. "[T]his court has recognized that '[i]ndividuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children.'" *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006) (quoting *Matter of A.C.B.*, 598 N.E.2d 570, 572 (Ind. Ct. App. 1992)), *trans. denied*. It was not clearly erroneous for the juvenile court to decide that the conditions resulting in Child's removal would not be remedied.[8]

### 2. Best Interests

[32] Mother next argues that DCS failed to prove by clear and convincing evidence that termination of Mother's parental rights is in Child's best interests. A determination of the best interests of a child should be based on the totality of

---

[8] Indiana Code section 31-35-2-4(b)(2)(B) is written such that, to properly effectuate the termination of parental rights, the trial court need only find that one of the three requirements of that subsection has been established by clear and convincing evidence. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied*. Because we have determined that sufficient evidence supports the conclusion that the conditions that resulted in the removal of Child will not be remedied, we need not address Mother's argument as to whether sufficient evidence supports the conclusion that the continuation of the parent-child relationship poses a threat to the well-being of Child.

the circumstances." *In re A.P.*, 981 N.E.2d 75, 82 (Ind. Ct. App. 2012). In making a determination of best interests, the juvenile court must subordinate the interests of the parent to that of the child. *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010), *trans. dismissed*. "The trial court need not wait until the child is irreversibly harmed such that her physical, mental, and social development is permanently impaired before terminating the parent-child relationship." *Id.* "Additionally, a child's need for permanency is an important consideration in determining the best interests of a child, and the testimony of the service providers may support a finding that termination is in the child's best interests. *Id.* (citing *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003)); *see also In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009) ("Permanency is a central consideration in determining the best interests of a child.").

[33] In challenging the court's "best interest" conclusion, Mother argues that it will be difficult to find an adoptive home for Child, and that Child has family members willing to provide guardianship. *Appellant's Br*. at 23-25. However, as we note below, DCS met its burden of proving that adoption is a satisfactory plan for Child. During the fact-finding hearing, FCM Lankford testified that while it might be difficult to find Child a permanent home, Child is adoptable. *Tr*. at 23. Additionally, there is no evidence, other than Mother's own testimony, indicating that there are suitable relatives willing to provide guardianship over Child. Instead, the evidence shows that: (1) Child was previously placed with Grandmother, who could neither stop Child from

smoking nor care for Child long term, *tr.* at 17; (2) DCS tried to place Child with Kentucky relatives, but the interstate compact for placement was denied, *DCS Ex.* 7; and (3) most identified relatives live out of state and do not have a relationship with Child, *tr.* at 23.

[34] Mother also argues that permanency does not justify termination. *Appellant's Br.* at 28. While permanency alone may be insufficient, there was evidence that Child's placement outside Mother's care was best for Child. FCM Lankford testified that Child had made a lot of progress within the six months prior to the TPR hearing, compared with the progress made during the initial year and a half. *Tr.* at 22. She also testified that DCS was recommending termination, even without a known adoptive family, because Child "is an adoptable child." *Id.* at 23. "[Child] is making progress through services although it might not be as quickly as we all would like . . . based on some of her mental health needs." *Id.* at 23-24. FCM Lankford asserted, "[We] still do have a long road ahead of us in terms of finding that . . . appropriate placement that is going to be stable for [Child] . . . but I don't think it's out of the question to move in that direction to find permanency for [Child] as [Mother's] going to be incarcerated for a longer period of time." *Id.* at 24. In fact, if Mother is released as late as June 2021, Child will be almost seventeen years old. *Id.* FCM Lankford also believed that termination and permanency in a new home was in Child's best interest to end her exposure to an environment of drug use. *Id.*

[35] CASA Richardson testified that termination of Mother's parental rights is in Child's best interests because Child "is a very special child" and she "needs a

permanent home so she can grow and so she can get the services that she needs. She's only 12 and she just has a long hard road ahead of her and she needs stability in her life." *Id*. at 37. CASA Richardson was also concerned about Mother's ability to provide Child with a safe and stable environment. *Id*. "We have previously held that the recommendation by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158-59 (Ind. Ct. App. 2013), *trans. denied*. The totality of the evidence supports the trial court's determination that termination of Mother's parental rights is in the Child's best interest.

### 3. Satisfactory Plan

[36] Mother argues that the juvenile court erroneously concluded that adoption is a satisfactory plan for the care and treatment of Child. *Appellant's Br.* at 29. While acknowledging that adoption is generally considered a satisfactory plan, Mother contends that it was not satisfactory under the unique circumstances of this case. *Id*. (citing *H.G. v. Ind. Dep't of Child Services*, 959 N.E.2d 272, 294 (Ind. Ct. App. 2011), *trans. denied*). Specifically, she argues that DCS failed to meet its burden of proving that the conditions resulting in Child's placement outside

the home will not be remedied.[9]  We disagree with Mother's assertion because, as discussed above, DCS met its burden of proving that conditions resulting in Child's placement outside the home will not be remedied.  Mother's argument is merely a request that we reweigh the evidence, which we will not do.  *In re J.C.,* 994 N.E.2d 278, 283 (Ind. Ct. App. 2013).

[37]  Mother also contends that DCS's determination that adoption is a satisfactory plan is premature because DCS cannot suggest a satisfactory plan with any accuracy or confidence until it determines whether family members could serve as appropriate guardians.  *Appellant's Br.* at 29.  Mother contends that, if other family members could serve as appropriate guardians for Child, termination of Mother's parental rights would be unnecessary and adoption would not be a satisfactory plan.  *Id.*  Here, DCS's plan for Child was adoption, which our court has found to be a satisfactory plan.   *See In re B.M.*, 913 N.E.2d 1283, 1287 (Ind. Ct. App. 2009) (noting that adoption is a satisfactory plan).  The DCS plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated.  *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 374 (Ind. Ct. App. 2007), *trans. denied*.  While DCS had not yet found suitable adoptive parents for Child, FCM Lankford testified that Child is adoptable and that DCS continues to search for a permanent home for Child.  *Tr.* at 23.  The

---

[9] Mother claims that DCS failed to meet its burden regarding both that (1) conditions resulting in removal will not be remedied; and (2) continuation of parent-child relationship poses a threat to Child's wellbeing. Because only one of these conditions need be proven, we have cited only to the former.

evidence supported the juvenile court's finding that DCS had a satisfactory plan for the care and treatment of Child.

[38] We will reverse a termination of parental rights only upon a showing of "clear error" – that which leaves us with a definite and firm conviction that a mistake has been made. *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997). Based on the record before us, we cannot say that the juvenile court's termination of Mother's parental rights to Child was clearly erroneous.

Affirmed.

Mathias, J., and Altice, J., concur.