## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 20 2018, 7:08 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Steven J. Halbert
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE DCS

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of Z.S., Minor Child, and F.S., Mother,

*Appellant-Respondent*,

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

and

Child Advocates, Inc.,

*Co-Appellee.*

November 20, 2018

Court of Appeals Case No.
18A-JT-1203

Appeal from the Marion Superior Court

The Honorable Gary Chavers, Judge Pro Tem

The Honorable Larry Bradley, Magistrate

Trial Court Cause No.
49D09-1610-JT-1080

**Brown, Judge.**

[1] F.S. ("Mother") appeals the involuntary termination of her parental rights with respect to Z.S. Mother raises two issues which we revise and restate as:

    I.      Whether the trial court abused its discretion when it admitted certain evidence; and

    II.    Whether the trial court erred in terminating her parental rights.

We affirm.

## Facts and Procedural History

[2] On May 7, 2013, Z.S. was born. On May 29, 2013, the Indiana Department of Child Services ("DCS") filed a petition alleging that D.T., born on April 24, 2009, D.S., born on March 17, 2011, and Z.S. were children in need of services ("CHINS"). The petition also stated that Z.S.'s meconium was positive for marijuana at birth and that Mother failed to provide the children with a safe and appropriate living environment free from substance abuse, recently tested positive for marijuana, and had an extensive history with DCS including prior CHINS and termination of parental rights actions.

[3] On June 12, 2013, the court held a pre-trial hearing, issued an order which states that Mother submitted an "admission to an amended petition and agreement on services,"[1] found the children to be CHINS, and proceeded with

---

[1] The form, Respondent's Admission to Amended Petition, Paragraph 4(a) states that DCS determined the three children to be CHINS because "Mother requires assistance providing a home free from substance abuse" and "Services: Home based, . . . , Random Drug Screens." Petitioner's Exhibit 4. In the space provided, the hand-written words, "Substance Abuse Assessment," beside the phrase "Services: Home based" have been crossed out and replaced with the hand-written words, "[Substance Abuse Assessment to be argued]." *Id.*

disposition. Petitioner's Exhibit 3. On the same day, the court issued both a dispositional order and a participation order. The latter required Mother to engage in home-based counseling and submit to random drug/alcohol screens and indicated that, in the event she tested positive, she was to submit to a substance abuse evaluation.

[4] On July 12, 2013, the court authorized the removal of the children from Mother. On July 15, 2013, the court issued a detention hearing order that continued the removal of the children "from Mother's care as the safety concerns and the home environment is in flux" and states that Mother "acknowledges there was a brief period where she left the home with her small children on or about 6-25-13"; that Mother and DCS describe "numerous people who are often in the home thereby contributing to the safety concerns"; and that DCS detailed "numerous questionable parenting decisions that endanger the children," including "leaving a four year old [sic] and a two year old [sic] unattended in a bathtub; leaving medications within reach of the children; having an unstable home environment by being 'put out' of her residence; and having items in the bed of the infant even after being educated about the dangers." Petitioner's Exhibit 8. The court's order also states that Mother "details a history that includes having 9 children, and the rights terminated as to some of them. Mother's explanation indicates that she does not accept responsibility for her current and prior actions." *Id.*

[5] On June 25, 2014, the court issued a permanency order that ordered Mother "dropped after this hearing" and states that Mother still needed to address her

drug issues and "even after one year, she still has not completed a substance abuse evaluation," that Mother's "last drop was May 29 and [sic] positive for THC," and that "both parents are looking for housing." Petitioner's Exhibit 15. On October 1, 2014, the court issued a periodic review order which states that Mother needed to complete her substance abuse assessment and continued to test positive for marijuana.

[6] On November 18, 2015, the court issued a periodic review hearing order that placed the children on temporary trial home visits with "[M]other . . . over DCS' and the GAL's objections" and ordered all therapies to continue in the home. Petitioner's Exhibit 20. On June 15, 2016, the court required Mother to submit to a drug screen following a periodic review hearing. The order from the periodic review hearing states in part that "DCS states Mother continues to screen positive for marijuana," and that Mother "apologizes for her positive screens but notes she has been going through a lot of things in her life," "states she only does drugs at night when the children are asleep, and "states she will be clean now and doing everything she can to keep her children." Petitioner's Exhibit 25.

[7] On August 17, 2016, the court held a detention hearing, ordered removal of the children from Mother's care, and issued a detention hearing order which states that Mother's screen from August 15, 2016 was also positive for THC, that DCS was requesting removal because Mother tested positive for drugs on multiple occasions and because they cannot ensure the safety and well-being of children in the home of a care-giver who is abusing drugs, and that Mother had

lost her housing, continued to struggle with drugs, and failed to call in for other drug screens. On September 7, 2016, the court changed the plan of permanency to adoption.

[8] On October 3, 2016, DCS filed its petition for involuntary termination of Mother's parental rights with respect to Z.S. On June 14, 2017, the court issued a permanency hearing order which states that "Mother's last drug screen was positive for cocaine and that was in May of 2017." Petitioner's Exhibit 31. In July 2017, DCS family case manager Jan Townsend ("FCM Townsend") made a referral for a substance abuse assessment, and Mother participated in the assessment "on or about September or October" 2017. Transcript Volume II at 107.

[9] On April 10 and 11, 2018, the court held a hearing, in which Tomlin Drug Testing's office technician Jazmin Crozier testified about the procedure of collecting urine specimens for drug analysis and that she collected a urine sample from Mother. A Redwood Toxicology Laboratory report, which was admitted at the hearing over the objection of Mother's counsel,[2] indicates that Crozier collected a sample from Mother on December 13, 2017, and states "Benzoylecgonine (Cocaine Metabolite) DETECTED (571 ng/mL)." Petitioner's Exhibit 49. Onsite technician Brittney Baker testified about the

---

[2] Specifically, Mother's counsel objected to Petitioner's Exhibit 49 because "the alleged collector [Crozier] testified at the start of the trial that she couldn't remember when she took a sample from [Mother]. Consequently, I object to exhibit forty-nine coming into evidence because there is no chain of custody established." Transcript Volume II at 69.

process of sample collection, that the sample "goes into a double sealed FedEx bag and . . . is overnighted to Redwood Toxicology" after being given, and that she followed these procedures on December 8, 15, and 18, 2017, to collect samples from Mother. Transcript Volume II at 88. Baker indicated she observed Mother give each of the samples and that each of the samples was under her sight and control during the collection and sealing process. Forensic toxicologist Kimberly Peterson ("Kimberly") testified that, when Redwood Toxicology Laboratory received the December 8, 13, 15, and 18, 2017 samples, the security seal was intact and that there was no note on the report regarding the integrity of the sample. The court admitted Petitioner's Exhibits 48, 50, and 51,[3] over the objection of Mother's counsel regarding the chain of custody.[4]

[10] Mother testified at the hearing and stated, "[y]eah, I guess," when asked if she tested positive throughout the CHINS case for "any other substance," and "[c]ocaine, as they claim," when asked to clarify which substance. *Id.* at 15. In response to the question of whether she "had not had any elicit substance use since [Z.S.'s] case opened," she stated "I stumbled, I am not going to lie, I am not going to dictate [sic] anything, yes I stumbled through my depression

---

[3] Exhibit 48 indicates that a urine sample was collected from Mother on December 8, 2017, and states "Benzoylecgonine (Cocaine Metabolite) DETECTED (1590 ng/ml)." Exhibit 50 indicates that a urine sample was collected from Mother on December 15, 2017, and states "Benzoylecgonine (Cocaine Metabolite) DETECTED (1110 ng/ml)." Exhibit 51 indicates that a urine sample was collected from Mother on December 18, 2017, and states "Benzoylecgonine (Cocaine Metabolite) DETECTED (7740 ng/ml)."

[4] Specifically, Mother's counsel objected to Petitioner's Exhibits 48, 50, and 51 because "[t]here has been insufficient foundation laid that- regarding a chain of custody from the time the sample was allegedly taken to the time it was tested." Transcript Volume II at 92.

because I was off of my meds, I didn't have anything – so yea, I tripped and I smoked." *Id.* at 24. She indicated that, after they "came home November seventeenth twenty fifteen," her children were "there for about a year" and were removed because she "tested positive for marijuana I guess." *Id.* at 36-37. During redirect examination, she testified that she knew why her children had been removed from her care, indicated she had previously answered "a couple of times" the question of whether anyone had ever told her why, and stated "(laughing) Because I tested positive for a drug" and "I don't know and don't care" when instructed by the court to answer the question again. *Id.* at 147.

[11] FCM Townsend testified that she was assigned to Z.S. "late August, early September" of 2016. *Id.* at 101. She indicated that she was made aware that Mother was ordered to comply with home-based therapy, random screens, and substance abuse assessment, and that home-based therapy was needed to address Mother's "mental health . . . as well as just address[] her children not being in her care and the affects [sic] she had from that." *Id.* at 104. She stated that the random drug screens were implemented because "of the reason why th[e] particular case was open due to substance abuse" and "so that DCS could see whether or not if [Mother] was maintaining her sobriety." *Id.* She indicated that Mother "has not been compliant with her random screens nor has she followed up with the substance abuse recommendations." *Id.* at 107.

[12] In response to being asked whether she made a referral subsequent to the one made in July 2017, FCM Townsend answered in the negative and stated that "that referral is actually still open for [Mother]." *Id.* She testified that, at some

point during the summer of 2017, DCS had recommended that "if [Mother] submitted to six weeks worth of clean drug screens," extended and unsupervised visitation time would be considered, but that "within three weeks into that agreement, [Mother] tested positive."[5] *Id.* at 118, 120. She indicated that, in October 2017, she received a report from a home-based therapist "that was only to inform me that she was discharging." *Id.* at 113. She testified she believed that termination of Mother's parental rights was in Z.S.'s best interests "because . . . the length of time and the reasons for the case being opened, those concerns has [sic] not been remedied at this time for her to be able to return home." *Id.* at 113.

[13] Home-based case manager Melissa James indicated that she contacted Mother in February 2017 after taking over her case the preceding month, that the reason for the closure of Mother's referral after working together "a few months" was that communication with her was nonexistent, and that she made several attempts to meet with Mother. *Id.* at 94.

[14] Guardian ad litem Alexia Peterson ("GAL Peterson") testified that the Child Advocates agreed with the termination of the parent-child relationship between Z.S. and Mother, that it would not be in Z.S.'s bests interests to allow Mother more time to complete services because she thought "that [Mother] has [sic] an

---

[5] During redirect examination, Mother's counsel objected to FCM Townsend's testimony that Mother had tested positive, and the court allowed the testimony "as to why the extended visitation, unsupervised [sic] didn't happen." Transcript Volume II at 120.

adequate amount of time to complete services and be reunified with the children," and that termination was in Z.S.'s best interests because "the issues of why the CHINS case had opened have not been remedied," Z.S. was "well cared for in her . . . pre-adoptive home," and Mother had "not completed her services to stay sober or have an appropriate housing for her children to be reunified with her." *Id.* at 44, 46, 51-52.

[15] Adult and Child staff therapist Renae Clark-Weatherly testified that she worked with Mother for approximately two years and set up the goals of "effective parenting skills, . . . substaining [sic] from drugs and . . . her personal skills as far as her anger and aggression". *Id.* at 75. She answered affirmatively when asked if Mother ever admitted to testing positive and stated that Mother had told her one time that "she was at a party and somebody spiked her punch or something of that nature." *Id.* at 76.

[16] On April 24, 2018, the court entered an order terminating Mother's parental rights, which provided:

> 4. [Z.S.] remained in-home but was ordered detained and placed outside the home after a detention hearing held on August 17, 2016 due to safety concerns, and concerns over continued drug use and lost housing.
>
> 5. [Z.S.] was found to be in need of services after [Mother] filed an admission that she required assistance providing a home free from substance abuse. The Court proceeded to disposition on that date.
>
> * * * * *

11. [Mother] has [sic] living in the residence of her adult daughter for the past three and one-half months. Prior to that, she lived with another adult daughter. There are concerns that both daughters have criminal issues regarding cocaine. At other times during [Z.S.'s] CHINS case, [Mother] resided with her mother.

12. [Mother] has never provided proof of having employment to [DCS].

13. [Mother] failed to complete therapy, although she did participate. The last therapy report was received in October of 2017, at which time sobriety was still a goal and [Mother's] therapist was recommending in-patient treatment.

\* \* \* \* \*

15. There is no evidence that [Mother] made any progress toward sobriety in five years other than doing a substance abuse assessment. She tested positive for cocaine four times during a ten-day period after completing the assessment.

16. [Mother] has a history of involvement with [DCS] that goes back seventeen years.

17. [Mother] consented to adoption for three children under an unsuccessful CHINS case filed in October of 2001.

18. [Mother's] parental rights were involuntarily terminated over a child on January 14, 2008, stemming from a 2006 CHINS case involving substance abuse and instability.

19. On April 24, 2009, [Mother] had her parental rights involuntarily terminated over another child due to substance abuse, instability and neglect.

20. [Mother] denied having her parental rights terminated, and denied substance abuse or possession of marijuana in previous cases.

21. [Mother] delivered a drug[-]positive baby in August of 2016.

Appellant's Appendix Volume II at 7-8. The order states that "[g]iven the history of years and years being unsuccessful in services in CHINS cases back to 2001, and her lack of progress in [Z.S.'s] case, [Mother] will not progress to reunification"; and that there is a reasonable probability that the conditions that resulted in Z.S.'s removal and continued placement outside the home will not be remedied by Mother, given that she "has had almost five years to complete services designed to address conditions of instability and substance abuse." *Id.* at 8. The court found that termination of the parent-child relationship was in Z.S.'s best interests.

## *Discussion*

### I.

[17] The first issue is whether the trial court abused its discretion when it admitted certain evidence. The admission of evidence is entrusted to the sound discretion of the juvenile court. *Matter of A.F.*, 69 N.E.3d 932, 941-942 (Ind. Ct. App. 2017) (citing *In re A.J.*, 877 N.E.2d 805, 813 (Ind. Ct. App. 2007), *trans. denied*), *trans. denied*. We will find an abuse of discretion only where the juvenile court's decision is against the logic and effect of the facts and circumstances before the court. *Id.* at 942. If a juvenile court abuses its discretion by admitting challenged evidence, we will reverse for that error only if it is inconsistent with substantial justice or if a substantial right of the party is affected. *Id.* (citing *In re S.W.*, 920 N.E.2d 783, 788 (Ind. Ct. App. 2010)).

[18] Mother argues certain drug test results were improperly admitted because they "do not meet the requirements for admissibility" and contends that there was no evidence of "who did the tests, so [Kimberly] could not testify that the results were created by someone with personal knowledge at or near the time of testing." Appellant's Brief at 13. She also asserts that the omission of the person testing the samples provides an indication of untrustworthiness sufficient for the court to have refused the admission of the results and argues that, because there is no evidence of who this person might have been, the chain of custody has been broken. The State asserts that Mother objected to the admission of the evidence "on the ground that there was a lack of a chain of custody showing that the sample tested was provided by Mother," argues that she failed to raise her objection on appeal with the trial court, and contends that even if Mother did not waive her argument on appeal, there was sufficient evidence to establish a chain of custody. Appellee's Brief at 17.

[19] We note that Mother cites to *Troxell v. State*, in which the Indiana Supreme Court found there was no error in the admission of evidence challenged by a criminal defendant claiming error in the chain of custody of a DNA sample and provided:

> To establish a proper chain of custody, the State must give reasonable assurances that the evidence remained in an undisturbed condition. *Cliver v. State*, 666 N.E.2d 59, 63 (Ind. 1996). However, the State need not establish a perfect chain of custody, and once the State "strongly suggests" the exact whereabouts of the evidence, any gaps go to the weight of the evidence and not to admissibility. *Wrinkles v. State*, 690 N.E.2d

1156, 1160 (Ind. 1997); *Jenkins v. State*, 627 N.E.2d 789, 793 (Ind. 1993) (noting that failure of FBI technician to testify did not create error). Moreover, there is a presumption of regularity in the handling of evidence by officers, and there is a presumption that officers exercise due care in handling their duties. *Wrinkles*, 690 N.E.2d at 1160; *Culver* [*v. State*, 727 N.E.2d 1062, 1067 (Ind. 2000)]. To mount a successful challenge to the chain of custody, one must present evidence that does more than raise a mere possibility that the evidence may have been tampered with. *Cliver*, 666 N.E.2d at 63.

778 N.E.2d 811, 814 (Ind. 2002). The *Troxell* Court also found that the absence of such information "goes to the weight of the evidence and not its admissibility." *Id.* at 815 (citing *Jenkins*, 627 N.E.2d at 793).

[20] Here, the record reveals that Crozier testified about the procedure of collecting urine specimens for drug analysis and that she collected a urine sample from Mother. We note that Petitioner's Exhibit 49 indicates that Crozier collected a sample from Mother on December 13, 2017. Baker testified about the process of sample collection, that the sample "goes into a double sealed FedEx bag and . . . is overnighted to Redwood Toxicology" after being given, and that she followed these procedures on December 8, 15, and 18, 2017, to collect samples from Mother. Transcript Volume II at 88. Baker indicated that she observed Mother give each of the samples and that each of the samples was under her sight and control during the collection and sealing process. Kimberly testified that, when Redwood Toxicology Laboratory received each of the samples, the security seal was intact and that there was no note on the report regarding the

integrity of the sample. Under these circumstances, we cannot say that the court abused its discretion when it admitted the challenged drug test results.

## II.

[21] The next issue is whether the trial court erred in terminating Mother's parental rights. In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. *See* Ind. Code § 31-35-2-8(a).

[22] The State's burden of proof for establishing the allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-

1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2), *reh'g denied*. This is "a 'heightened burden of proof' reflecting termination's 'serious social consequences.'" *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (quoting *In re G.Y.*, 904 N.E.2d at 1260-1261, 1260 n.1). "But weighing the evidence under that heightened standard is the trial court's prerogative—in contrast to our well-settled, highly deferential standard of review." *Id*. We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. *Id*. We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment. *Id*.

[23] Reviewing whether the evidence clearly and convincingly supports the findings, or the findings clearly and convincingly support the judgment, is not a license to reweigh the evidence. *Id*. "[W]e do not independently determine whether that heightened standard is met, as we would under the 'constitutional harmless error standard,' which require *the reviewing court itself* to 'be sufficiently confident to declare the error harmless beyond a reasonable doubt.'" *Id*. (quoting *Harden v. State*, 576 N.E.2d 590, 593 (Ind. 1991) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967))). "Our review must 'give "due regard" to the trial court's opportunity to judge the credibility of the witnesses firsthand,' and 'not set aside [its] findings or judgment unless clearly erroneous.'" *Id*. (quoting *K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cty. Office*, 989 N.E.2d 1225, 1229 (Ind. 2013) (citing Ind. Trial Rule 52(A))). "Because a

case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *Id*. at 640.

[24] We note that the involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B). Because we find it to be dispositive under the facts of this case, we limit our review to whether DCS established that there was a reasonable probability that the conditions resulting in the removal or reasons for placement of Z.S. outside the home will not be remedied. *See* Ind. Code § 31-35-2-4(b)(2)(B)(i).

[25] Mother contends that "[t]he CHINS as to Z.S. was based on [Mother's] admission stating that she 'requires assistance providing a home free from substance abuse,'" and argues that the trial court based its finding in support of its disposition order "on issues and conduct which were not part of the CHINS admission" and focused on issues "which were allegedly related to the 'continued' placement outside the home rather than the initial placement." Appellant's Brief at 9-10. DCS argues that Mother does not challenge specifically any of the trial court's findings of fact and the court properly considered the reasons for Z.S.'s continued placement outside Mother's home. It contends that, "[i]n sum, nothing changed for Mother," and that, while she may have shown periods of improvement early in the CHINS case, Mother continued to use illegal substances including shortly before the termination factfinding. Appellee's Brief at 27.

In determining whether the conditions that resulted in Z.S.'s removal will not be remedied, we engage in a two-step analysis. *See In re E.M.*, 4 N.E.3d at 642-643. First, we identify the conditions that led to removal, and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions, balancing a parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of future behavior. *Id.*

We note that the statute "does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home." *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013) (citation and internal quotation marks omitted). A court may consider evidence of a parent's prior criminal history, history of neglect, failure to provide support, lack of adequate housing and employment, and the services offered by DCS and the parent's response to those services, and, where there are only temporary improvements and the pattern of conduct shows no overall progress, the court

might reasonably find that under the circumstances the problematic situation will not improve. *Id.* A trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth are permanently impaired before terminating the parent-child relationship. *In re Z.C.*, 13 N.E.3d 464, 469 (Ind. Ct. App. 2014), *trans. denied*.

[28] We also note that, to the extent Mother does not challenge the court's findings, any unchallenged facts stand as proven. *See In re Involuntary Termination of Parent-Child Relationship of B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge findings by the trial court resulted in waiver of the argument that the findings were clearly erroneous), *trans. denied*; *McMaster v. McMaster*, 681 N.E.2d 744, 747 (Ind. Ct. App. 1997) (when the father failed to challenge specific findings, this Court accepted them as true).

[29] The record reveals that the court's June 12, 2013 dispositional order required Mother to engage in home-based counseling and submit to random drug/alcohol screens and indicated that, in the event she tested positive, she was to submit to a substance abuse evaluation. On July 12, 2013, the court authorized the removal of the children and, on July 15, 2013, the court issued a detention hearing order which continued the removal of the children and which stated that Mother detailed "a history that includes having 9 children, and the rights terminated as to some of them." Petitioner's Exhibit 8. The court's June 15, 2016 order states in part that Mother "apologizes for her positive screens" and that she "states she only does drugs at night when the children are asleep." Petitioner's Exhibit 25. On August 17, 2016, the court ordered removal of the

children after having previously granted a temporary trial home visit with Mother and issued a detention hearing order which states that Mother had failed to call in for drug screens and had "lost her housing and continues to struggle with drugs" and that her August 15, 2016 screen was positive for THC. Petitioner's Exhibit 27. We observe that Mother indicated at the hearing that her children were removed because she tested positive for marijuana, she responded affirmatively when asked if she tested positive throughout the CHINS case for "any other substance," that she stated "[c]ocaine, as they claim" when asked to clarify, and that she testified "yea, [she] tripped and [she] smoked." Transcript Volume II at 15. We further observe the court's findings that there was no evidence Mother made any progress toward sobriety in five years other than completing a substance abuse assessment and that she "tested positive for cocaine during a ten-day period after completing the assessment." Appellant's Appendix Volume II at 8. Considering the evidence as set out above and in the record, along with the court's other unchallenged findings, we conclude that clear and convincing evidence supports the trial court's determination that there is a reasonable probability that the conditions leading to Z.S.'s removal will not be remedied.

[30]   As to Z.S.'s best interests, we observe that FCM Townsend testified she believed that termination of Mother's parental rights was in Z.S.'s best interests "because . . . the length of time and the reasons for the case being opened, those concerns has [sic] not been remedied at this time for her to be able to return home." Transcript Volume II at 113. We also observe that GAL Peterson

indicated that it would not be in Z.S.'s bests interests to allow Mother more time to complete services because she thought "that [Mother] has [sic] an adequate amount of time to complete services and be reunified with the children," and that termination was in Z.S.'s best interests because "the issues of why the CHINS case had opened have not been remedied," Z.S. was "well cared for in her . . . pre-adoptive home," and Mother had "not completed her services to stay sober or have an appropriate housing for her children to be reunified with her." *Id.* at 44, 46, 51-52. Our review of the evidence in the record reveals that the evidence supports the trial court's best interests determination.

### Conclusion

[31] We conclude that the trial court did not err in terminating Mother's parental rights.

[32] Affirmed.

Altice, J., and Tavitas, J., concur.