## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 12 2019, 8:50 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

A. David Hutson
Hutson Legal
Jeffersonville, Indiana

John L. Grannan
Assistant Public Defender
Clark County Public Defender's Office
Jeffersonville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Robert J. Henke
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of K.C., Mother, D.C., Father, and D.C., D'A.C., Da.C., and K.C., Children,

K.C.,

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

November 12, 2019

Court of Appeals Case No. 19A-JT-685

Appeal from the Clark Circuit Court

The Honorable Vicki L. Carmichael, Judge

Trial Court Cause Nos.
10C04-1808-JT-31
10C04-1808-JT-32
10C04-1808-JT-33
10C04-1808-JT-34

**Kirsch, Judge.**

[1] K.C. ("Mother") appeals the juvenile court's order terminating her parental rights to her children, D.C., D'A.C., Da.C., and K.C. ("Children"). Mother raises several issues on appeal, which we consolidate and restate as:

> I. Whether the juvenile court abused its discretion when it admitted drug screen results under the business records exception to the rule against hearsay; and

> II. Whether the juvenile court's order terminating Mother's parental rights to Children was clearly erroneous because (A) the evidence did not support the findings of fact and (B) the findings of fact did not support the juvenile court's conclusions that there was a reasonable probability that the conditions that resulted in Children being removed and placed outside of Mother's care would not be remedied and that termination of Mother's parental rights was in the best interests of Children.

[2] We affirm.

## Facts and Procedural History

[3] Mother and D.C. ("Father")[1] are the parents of D.C., born January 27, 2008, D'A.C., born December 8, 2010, Da.C., born October 21, 2012, and K.C., born November 20, 2013. *Appellant's App. Vol. 2* at 36, 40, 44, 48. Mother also has a

---

[1] Father's parental rights were also terminated on February 22, 2019 in the same order that terminated Mother's parental rights. However, Father does not join in this appeal. We will, therefore, confine the facts to only those pertinent to Mother's appeal.

sixteen-year-old daughter, M.M., who was not the biological daughter of Father. *Tr. Vol. 2* at 7.

[4] In 2014, Mother became involved with the Indiana Department of Child Services ("DCS") because she was dealing marijuana out of her home while Children were present. *Id.* at 61. At that time, Children were removed from Mother's care for several months, and when they were returned to Mother's care, there was no running water or electricity. *Id.* at 9. At that time, there was also domestic violence occurring in the home, where Father would hit and choke Mother. *Id.* at 8.

[5] In May 2016, DCS received a report alleging Children were victims of neglect because Mother and a friend were parenting Children while under the influence of illegal substances. *Id.* at 61. DCS removed Children[2] from Mother's care on May 13, 2016, after Mother tested positive for methamphetamine and amphetamine. *Ex. Vol. 3* at 33; *Tr. Vol. 2* at 61-62. Father was incarcerated at that time for charges relating to domestic violence between him and Mother. *Tr. Vol. 2* at 85-86. Mother had a history of DCS involvement due to her drug use and tested positive for amphetamine and methamphetamine on May 7, 2016. On May 16, 2016, DCS filed petitions alleging that Children were children in need of services ("CHINS") due to Mother's substance abuse issues and her admission that she wanted to kill herself. *Ex. Vol. 3* at 24-27, 75-78,

---

[2] Although M.M. was also removed from Mother's care at the same time as Children, the record is unclear as to why M.M. was not a part of the termination proceedings at issue.

130-33, 186-89. On June 2, 2016, Mother admitted that Children were CHINS due to her substance abuse issues, which required treatment. *Id*. at 6, 34, 85, 140, 196. On June 14, 2016, the juvenile court entered its order adjudicating Children as CHINS, and on August 20, 2016, it entered its dispositional decree and order of participation. *Id*. at 6-7, 8. The juvenile court ordered Mother to maintain contact with the Family Case Manager ("FCM"), keep all appointments with service providers, participate and complete an intensive family preservation program, complete a substance abuse assessment and follow all recommended treatment, submit to random drug screens, maintain suitable housing, and attend all scheduled visitations. *Id*. at 36-41, 87-92, 142-47, 198-203.

[6] Mother "had a lengthy history of using substances" and had used drugs since she was a teenager. *Tr. Vol. 2* at 97. In November 2016, after being referred by DCS, Mother completed a substance abuse assessment with Danielle Blair ("Blair"), a clinical therapist. *Id*. at 96. During the assessment, Mother "presented with anxiety and depression symptoms[,] and . . . she . . . admitted to marijuana use at that time." *Id*. at 97. Mother also had a "lengthy history of domestic violence and early childhood trauma." *Id*. at 102. Blair recommended that Mother participate in individual therapy to address substance use, triggers, and coping skills; case management; parenting education; and more education on substance use." *Id*. at 98. Blair believed that without treatment, Mother would continue to have problems with substance

abuse because Mother "was presenting with little coping skills or ability to manage her emotions," and "she needed more support." *Id*.

[7] In December 2016, Mother began treatment with Blair with the goals being to address past trauma, establish coping skills and emotion regulation, understand the link between her personal history and substance use, and develop a recovery and management safety plan. *Id*. at 98-99. Mother's participation in treatment was not consistent; there were periods where she would engage in treatment consistently for weeks or a month, and then her participation would "[f]all off." *Id*. at 99. There were several times when Mother was incarcerated and unable to attend. *Id*. Blair was able to provide treatment to Mother during her incarceration, but not as consistently as when she was not incarcerated. *Id*. It was difficult for Blair to manage Mother's recovery without long-term consistent treatment. *Id*. at 100. The last time Blair met with Mother was when she saw her in the Clark County Jail in November 2018. *Id*. at 99.

[8] While the present case was pending, Mother frequently tested positive for illegal substances, and in November 2017, the juvenile court, after a hearing on the parents' progress, found that Mother had ten positive drug screens since May 2017 and had refused two screens since September 2017. *Ex. Vol. 3* at 52-54, 214-16. The State filed petitions to revoke Mother's probation, in part, because she tested positive for amphetamine and methamphetamine on September 11 and October 4, 2017. *Ex. Vol. 4* at 39-41, 62, 68. Mother admitted that she did not refrain from drug use prior to her incarceration and that she would have "spurts where [she] would be clean" and then would relapse. *Tr. Vol. 2* at 4.

[9]     On January 31, 2017, Mother was charged with Level 6 felony possession of methamphetamine, Class C misdemeanor possession of paraphernalia, and Level 6 felony auto theft. *Ex. Vol. 4* at 24, 33-36. On April 17, 2017, Mother pleaded guilty to Level 6 felony possession of methamphetamine and Level 6 felony auto theft and was sentenced to an aggregate sentence of two years with one year suspended to probation. *Id.* at 27, 37. Several petitions to revoke probation were filed against Mother because she tested positive for illegal substances and failed to comply with substance abuse treatment. *Id.* at 28-31, 39-41, 43, 57-60, 63-66. As a result of these petitions to revoke, Mother's suspended sentence was revoked, and she was serving that sentence at the time of the termination proceedings. *Tr. Vol. 2* at 41-44. During the CHINS and termination proceedings, Mother was also charged with several more offenses, including Level 6 felony escape, Level 6 felony possession of methamphetamine, Level 6 felony possession of methamphetamine, Level 6 felony possession of a narcotic drug, Class A misdemeanor possession of a synthetic drug or lookalike substance, Class C misdemeanor possession of paraphernalia, Level 6 felony theft, and Class B misdemeanor unauthorized entry of a motor vehicle. *Ex. Vol. 4* at 73, 78, 90, 98.

[10]    Supervised visitation between Mother and Children began in July or August 2016, and Mother was mainly compliant and regularly participated, missing approximately one visit per month. *Tr. Vol. 2* at 68, 124. Children enjoyed seeing Mother, and there were no major concerns during visitation. *Id.* at 124. The referral was closed in November 2017 when Mother was incarcerated. *Id.*

at 68, 124. In January 2018, after Mother was released from jail, Children's therapist, Nina Fox ("Fox"), took over supervising visitations between Mother and Children. *Id*. at 23-24. Mother was supposed to contact Fox to schedule visits, but she failed to do so, and then she became incarcerated again. *Id*. at 24. The only visitation that Fox supervised between Mother and Children occurred during the summer of 2018 at the jail while Mother was incarcerated. *Id*. at 22, 24. That visitation was the last time Children saw Mother. *Id*. at 24.

[11] Since the beginning of the CHINS case, Children received therapeutic services from Fox. *Id*. at 21. She has sessions with Children once or twice a week, and she met with Children both individually and as a group. *Id*. at 28-29. Fox worked with Children on emotional stability because they had been through a lot of trauma and had attachment, anger, and behavioral issues. *Id*. at 21. Following the visit between Children and Mother in jail, Fox had to work with Children on anger and grief and dealing with the rejection of not having Mother in their lives. *Id*. at 25.

[12] On August 9, 2018, DCS filed petitions to terminate Mother's parental rights to Children. *Appellant's App. Vol. 2* at 36-51. On January 8 and 15, 2019, the juvenile court held an evidentiary hearing on the petitions. *Id*. at 7, 13-14, 19-20, 25-26. At the time of the hearing, Mother was incarcerated in part for the probation revocations that were filed against her, and she had been incarcerated for approximately eight months. *Tr. Vol. 2* at 40. Mother testified that her release date was in May 2019. *Id*. at 41.

At the time of the evidentiary hearing, Children had been placed in the same foster home and were doing well. *Id.* at 62-63. At the hearing, Fox testified that she believed it was in Children's best interests to remain in their current foster home and for Mother's parental rights to be terminated because Children have gone through this "rollercoaster ride" long enough. *Id.* at 25. The FCM testified that termination of Mother's parental rights was in Children's best interests because Children have been removed from Mother's care for a total time of almost four years, including their removal in the prior DCS case, and Children are currently in a home that allows them to do normal activities and that "is the best thing for them moving forward." *Id.* at 69-71. The court appointed special advocate ("CASA") also recommended the termination of Mother's parental rights because Children were in a loving home that provided them with stability, and she testified that she believed that termination was in Children's best interests. *Id.* at 131. DCS's plan for Children upon the termination of parental rights was adoption. *Id.* at 71.

At the conclusion of the hearing, the juvenile court took the matter under advisement. On February 22, 2019, the juvenile court issued its order terminating Mother's parental rights to Children. Mother now appeals.

## Discussion and Decision

## I.     Admission of Evidence

Mother argues that the trial court abused its discretion when it admitted certified drug screens from Forensic Fluid Laboratories and Redwood

Toxicology. The admission of evidence is entrusted to the sound discretion of the juvenile court. *In re A.F.*, 69 N.E.3d 932, 941-42 (Ind. Ct. App. 2017), *trans. denied*. We will find an abuse of discretion only where the juvenile court's decision is against the logic and effect of the facts and circumstances before the court. *Id.* at 942. "If a juvenile court abuses its discretion by admitting the challenged evidence, we will reverse for that error only if the error is inconsistent with substantial justice or if a substantial right of the party is affected." *Id.*

[16] Mother contends that it was an abuse of discretion for the juvenile court to admit DCS Exhibits 12, 13, and 14, her drug test results, which were admitted over her objection, because they were hearsay. Specifically, Mother asserts that the exhibits did not qualify as business records and were, therefore, not admissible under that exception. She maintains that the exhibits were not business records because the drug test results were documented for the benefit of DCS and the laboratories that produced the reports do not depend on the records to function.[3]

---

[3] Mother relies on a recent opinion of this court for her argument, *In re L.S.*, 125 N.E.3d 628 (Ind. Ct. App. 2019). In that case, a panel of this court found that the reports of the mother's drug test results did not fall under the business records exception because it was not shown that the laboratory that produced the reports depended on the records to operate or conduct business, and instead, the drug test results were documented for the benefit of DCS, necessitating expert testimony and the opportunity for cross-examination for the admission of the evidence. *Id.* at 634. However, the court went on to find that the admission of the drug test results was harmless because the trial court's judgement was supported by substantial independent evidence. *Id.* DCS brings to our attention another recent case from a different panel of this court, where drug test results were found to fall under the business records exception because the laboratory functions independently from any law enforcement body or state agency. *In re K.R.*, No. 19A-JT-478, 2019 WL

[17]     Assuming, without deciding, that it was error for the juvenile court to introduce DCS Exhibits 12, 13, and 14 under the business records exception to the rule against hearsay, we conclude that it was harmless error.  "'The improper admission of evidence is harmless error when the judgment is supported by substantial independent evidence to satisfy the reviewing court that there is no substantial likelihood that the questioned evidence contributed to the judgment.'"  *In re L.S.*, 125 N.E.3d 628, 633 (Ind. Ct. App. 2019) (quoting *In re E.T.*, 808 N.E.2d 639, 645 (Ind. 2004)).  Here, the juvenile court's judgment, as discussed below, was supported by substantial evidence independent of these exhibits that satisfy us that its determination stands without reliance on those exhibits.

## II.    Findings and Conclusions

[18]     As our Supreme Court has observed, "Decisions to terminate parental rights are among the most difficult our trial courts are called upon to make.  They are also among the most fact-sensitive -- so we review them with great deference to the trial courts[.]"  *E.M. v. Ind. Dep't of Child Servs.*, 4 N.E.3d 636, 640 (Ind. 2014).  While the Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise her child and parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet her

4678411, at *5 (Ind. Ct. App. Sept. 26, 2019).  Because we determine that any error in admitting the evidence in the present case was harmless, we do not reach the possible conflict between these two cases.

responsibility as a parent. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005); *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. Parental rights are not absolute and must be subordinated to the child's interests in determining the appropriate disposition of a petition to terminate the parent-child relationship. *In re J.C.*, 994 N.E.2d 278, 283 (Ind. Ct. App. 2013). The purpose of terminating parental rights is not to punish the parent but to protect the child. *In re D.P.*, 994 N.E.2d 1228, 1231 (Ind. Ct. App. 2013). Termination of parental rights is proper where the child's emotional and physical development is threatened. *Id*. The juvenile court need not wait until the child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id*.

[19] When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re H.L.*, 915 N.E.2d 145, 149 (Ind. Ct. App. 2009). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id*. Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Id*. at 148-49. A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *In re S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004).

[20] Where, as here, the juvenile court entered specific findings and conclusions, we apply a two-tiered standard of review. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008), *trans. denied*. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id*. A finding is clearly erroneous only when the record contains no facts or inferences drawn therefrom that support it. *Id*. If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied.*

[21] Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

> (B)  that one (1) of the following is true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

> (C)  that termination is in the best interests of the child; and

> (D)  that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases is one of clear and convincing evidence. *In re H.L.*, 915 N.E.2d at 149. Moreover, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a) (emphasis added).

### A. Findings Not Supported by the Evidence

Mother first argues that sixteen of the juvenile court's findings are merely recitations of testimony and are, therefore, improper findings of fact. Under Indiana Code section 31-35-2-8(c), a juvenile court "shall enter findings of fact that support the entry of the conclusions" to terminate the parent-child relationship. "'A court or an administrative agency does not find something to be a fact by merely reciting that a witness testified to X, Y, or Z. Rather, the trier of fact must find that what the witness testified to is the fact.'" *Moore v. Jasper Cty. Dep't of Child Servs.*, 894 N.E.2d 218, 224 (Ind. Ct. App. 2008) (quoting *In re T.J.F.*, 798 N.E.2d 867, 874 (Ind. Ct. App. 2003)). "Additionally, the trier of fact must adopt the testimony of the witness before the 'finding' may be considered a finding of fact." *In re T.J.F.*, 798 N.E.2d at 874. This rule ensures that the parties "know the evidentiary bases upon which the ultimate finding rests" and "enable[s] [them] to formulate intelligent and specific arguments on review." *Id.* (citing *Perez v. U.S. Steel Corp.*, 426 N.E.2d 29, 32 (Ind. 1981)).

[23] Mother is correct that sixteen of the juvenile court's findings of fact[4] appear to be a mere recitation of the evidence presented. *See Appellant's App. Vol. 2 at 28, 29, 32.* However, these findings of fact are proper because the juvenile court found the cited testimony of the witnesses that was set forth in the findings of fact to be true and it adopted the testimony as such. Before setting forth its findings of fact, the juvenile court specifically stated, "The Court finds the following facts and reasonable inferences of fact by clear and convincing evidence." *Id.* at 28. Therefore, the juvenile court, in its order, notified Mother as to "the evidentiary bases upon which the ultimate finding rests." *In re T.J.F.*, 798 N.E.2d at 874.

[24] Mother next argues that nineteen other findings of fact are not valid because there is no evidentiary support without DCS Exhibits 12, 13, and 14. Specifically, she asserts that findings 31, 32, 34, 35, 36, 38, 41, 43, 44, 45, 49, 50, 51, 52, 53, 54, 55, and 58 should not be considered by this court because they have no evidentiary support in the record.[5] DCS concedes that, with the exclusion of DCS Exhibits 12, 13, and 14, findings 31, 35, 36, 38, 41, 44, 45, 49, 50, 52, and 53 are not supported by the evidence presented at the hearing.

---

[4] We note that four of these sixteen findings do not refer to Mother and are solely related to Father.

[5] In her Appellant's Brief, Mother also argues that finding 33 does not have evidentiary support; however, in her Reply Brief, she concedes that finding 33 was not based on DCS Exhibits 12, 13, and 14, and therefore, can be considered in our determination. *Appellant's Br.* at 16; *Reply Br.* at 7. We also note that finding 58 only relates to drug use by Father and, therefore, does not pertain to the termination of Mother's parental rights. *Appellant's App. Vol. 2* at 31.

[25]     However, findings 32, 34, 43, 51, 54, and 55 were supported by evidence that was independent from DCS Exhibits 12, 13, and 14. Findings 32 and 34 state that on both November 20 and 28, 2016, Mother tested positive for amphetamine and methamphetamine. *Appellant's App. Vol. 2 at 29.* The FCM testified without any objection that Mother tested positive for amphetamine and methamphetamine on November 20 and 28, 2016. *Tr. Vol. 2 at 86-87.* Finding 43 states that on June 6, 2017, Mother tested positive for alcohol and buprenorphine, and finding 51 states that on July 13, 2017, Mother tested positive for alcohol and opiates. *Appellant's App. Vol. 2 at 30.* The records from the underlying CHINS cases show that Mother tested positive for alcohol and Suboxone [buprenorphine] on June 6, 2017 and that she tested positive for alcohol and Hydrocodone on July 13, 2017.[6] *Ex. Vol. 3 at 14, 15, 176, 177.* Findings 54 and 55 state that on both September 11 and October 4, 2017, Mother tested positive for amphetamine and methamphetamine. *Appellant's App. Vol. 2 at 30.* DCS Exhibit 7, which consisted of records of a probation revocation filed against Mother, supported this finding. *Ex. Vol. 4 at 40, 44-45, 62, 68.*

---

[6] At the beginning of its order, the juvenile court took judicial notice of its own previous findings and orders in the underlying CHINS cases and the records from the underlying CHINS cases were admitted into evidence at the evidentiary hearing without any objection. *Appellant's App. Vol. 2 at 27; Tr. Vol. 2 at 6.* Under Indiana Evidence Rule 201(b), a court may take judicial notice of records of other court proceedings, and if those records are included in the record on appeal, they can be relied upon by a party in making its arguments. *In re D.K.*, 968 N.E.2d 792, 796-97 (Ind. Ct. App. 2012).

### B. Conclusions Not Supported by the Findings

[26] Mother first argues that the juvenile court's findings did not support its conclusion that there was a reasonable probability that the conditions that resulted in Children's removal and continued placement outside of the home would not be remedied. She asserts that the juvenile court's findings do not support that her drug use would not be remedied because many of the findings were not valid, and those that were, are not sufficient to support the conclusion that conditions will not be remedied because they did not establish "a pattern that created a probability of future neglect." *Appellant's Br.* at 20.

[27] In determining whether there is a reasonable probability that the conditions that led to a child's removal and continued placement outside the home will not be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, we must ascertain what conditions led to the child's placement and retention in foster care, and, second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id*. In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against "'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *E.M.*, 4 N.E.3d at 643 (quoting *K.T.K.*, 989 N.E.2d at 1231). Pursuant to this rule, "trial courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of

adequate housing and employment." *In re D.B.*, 942 N.E.2d 867, 873 (Ind. Ct. App. 2011). In addition, DCS need not provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *In re Involuntary Termination of Parent-Child Relationship of Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *E.M.,* 4 N.E.3d at 643. When determining whether the conditions for the removal would be remedied, the trial court may consider the parent's response to the offers of help. *D.B.,* 942 N.E.2d at 873.

[28]   Here, the conditions that led to Children's removal was neglect related to Mother's substance abuse. *Appellant's App. Vol. 2* at 28. As a result of the CHINS adjudication, Mother was ordered to maintain stable housing, not use illegal drugs, obey the law, participate in intensive family preservation services, participate in home-based counseling, complete a substance abuse assessment, complete random drug screens, follow all terms of probation, and participate in visitation. *Id.* at 36-41, 87-92, 142-47, 198-203. However, the evidence presented at the evidentiary hearing showed that Mother failed to accomplish many of these objectives.

[29]   DCS provided Mother with substance abuse treatment through Blair, but Mother failed to consistently attend treatment. *Tr. Vol. 2* at 96-99. Mother completed a substance abuse assessment with Blair, who recommended that Mother participate in individual therapy to address substance use, triggers, and

coping skills; case management; parenting education; and more education on substance use." *Id*. at 98. Blair believed that without treatment, Mother would continue to use illegal substances because she would not have the "coping skills or ability to manage her emotions." *Id*. Mother began treatment in December 2016; however, it was difficult for Blair to manage Mother's recovery without long-term consistent treatment. *Id*. at 98, 100. There were periods where Mother would engage in treatment consistently for a month, and then her participation would "[f]all off," and Mother's stints of incarceration made her unable to attend treatment. *Id*. at 99. The last time Blair met with Mother was when she saw her in the Clark County Jail in November 2018. *Id*.

[30]  Mother "had a lengthy history of using substances" and had used drugs since she was a teenager. *Id*. at 97. Evidence was presented that Mother continued to struggle with substance abuse and continued to use drugs. As discussed above, evidence was presented to show that throughout the proceedings, she tested positive for illegal drugs and alcohol, beginning in November 2016 and continuing until at least October 2017. Additionally, Mother engaged in multiple drug-related criminal activities while the termination proceedings were pending. In April 2017, Mother pleaded guilty to Level 6 felony possession of methamphetamine and Level 6 felony auto theft. *Ex. Vol. 4* at 27, 37. Several petitions to revoke probation were filed against Mother because she tested positive for illegal substances and failed to comply with substance abuse treatment. *Id*. at 28-31, 39-41, 43, 57-60, 63-66. As a result of these petitions to revoke, Mother's suspended sentence was revoked, and she was incarcerated at

the time of the termination proceedings and still had approximately four months to serve. *Tr. Vol. 2* at 41-44. Mother was also charged with numerous other charges, including Level 6 felony escape, two counts of Level 6 felony possession of methamphetamine, Level 6 felony possession of a narcotic drug, Class A misdemeanor possession of a synthetic drug or lookalike substance, Class C misdemeanor possession of paraphernalia, Level 6 felony theft, and Class B misdemeanor unauthorized entry of a motor vehicle. *Ex. Vol. 4* at 73, 78, 90, 98.

[31] Further, Mother did not consistently maintain contact with her FCM, and although the evidence showed that Mother participated in some visitations with Children, she was not consistent in doing so due to her frequent incarceration. *Tr. Vol. 2* at 68, 69, 124. DCS is not required to rule out all possibilities of change; it need only establish that there is a reasonable probability the parent's behavior will not change. *In re Kay L.,* 867 N.E.2d at 242. "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*. Also, as we have recognized, "Even assuming that [the parent] will eventually develop into a suitable parent, we must ask how much longer [the child] should have to wait to enjoy the permanency that is essential to her development and overall well-being." *Castro*

*v. State Office of Family & Children*, 842 N.E.2d 367, 375 (Ind. Ct. App. 2006), *trans. denied.*

[32] At the time of the evidentiary hearing, Children had been removed from the home, and DCS had been working with Mother for almost three years, and Mother had barely complied with any of the services provided by DCS. She had not remedied her substance abuse issues and had only minimally participated in other services. This failure to consistently participate in services in order to reunify with Children, as well as Mother's continued use of drugs and engagement in criminal activity, supported the juvenile court's conclusion that there was a reasonable probability Mother would not remedy the conditions resulting in Children's removal and continued placement outside her care.

[33] Mother next argues that the juvenile court's findings did not support its conclusion that termination of her parental rights was in the best interests of Children. She contends that, contrary to the juvenile court's finding, the evidence did not support that the FCM, Children's therapist, and CASA recommended that termination was in the best interests of Children. Mother further asserts that the totality of the evidence did not support the juvenile court's conclusion because there was undisputed evidence that Children were bonded with Mother and that Mother interacted appropriately with Children during visitations, and there was nothing in the record to suggest that Children would be harmed by continued placement with the foster family until Mother could be reunited with them. Mother also points to testimony from Children's

therapist and the FCM that seemed to suggest that Children should continue to have a relationship with Mother.

[34] In determining what is in the best interests of the child, a trial court is required to look at the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010) (citing *In re D.D.,* 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*), *trans. dismissed.* In doing so, the trial court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. *Id.* (citing *In re R.S.,* 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied*). A parent's historical inability to provide a suitable, stable home environment along with the parent's current inability to do so supports a finding that termination is in the best interests of the child. *In re A.P.* 981 N.E.2d 75, 82 (Ind. Ct. App. 2012). Testimony of the service providers, in addition to evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests. *In re A.S.,* 17 N.E.3d 994, 1005 (Ind. Ct. App. 2014), *trans. denied*.

[35] A juvenile court need not wait until a child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *In re A.K.*, 924 N.E.2d at 224. Additionally, a child's need for permanency is an important consideration in determining the best interests of a child. *Id.* (citing *McBride v. Monroe Cty. Office of Family & Children,* 798 N.E.2d 185, 203 (Ind. Ct. App. 2003)).

[36] At the time of the termination hearing, Children had been removed from Mother's care for almost three years, and Mother had failed to make the changes necessary to provide Children with a safe and healthy environment. As discussed above, DCS presented sufficient evidence that there was a reasonable probability that Mother would not remedy the reasons for Children's removal from her care because she continued to use drugs and engage in criminal activity. Further, at the time of the evidentiary hearing, Mother was incarcerated in part for activity related to drugs. Additionally, the FCM and the CASA, as well as the Children's therapist, all testified that they believed termination of Mother's parental rights would be in Children's best interests. *Tr. Vol. 2* at 25, 69-70, 131. The FCM testified that she believed Children were entitled to permanency and being in the foster home was the best thing for Children "moving forward." *Id*. at 71. The CASA testified that she recommended that Mother's parental rights be terminated because Children were entitled to stability and a caring home, which the foster home was providing. *Id*. at 131. Based upon the totality of the evidence, we conclude that the evidence supported the juvenile court's determination that termination of Mother's parental rights was in Children's best interests. Mother's arguments to the contrary are a request to reweigh the evidence, which we cannot do. *In re H.L.*, 915 N.E.2d at 149.

[37] Based on the record before us, we cannot say that the juvenile court's termination of Mother's parental rights to Children was clearly erroneous. We, therefore, affirm the juvenile court's judgment.

Affirmed.

Baker, J., and Crone, J., concur.